17 F.3d 1126
 RESOLUTION TRUST CORPORATION, Appellant,
v.
A.P. EASON, Jr.; Rex A. Smith; J.F. Robinson; J. Warren
Murray; Joe A. Upchurch; Delbert A. Allen, Appellees,
James E. Shreve, Defendant.
RESOLUTION TRUST CORPORATION, Appellee,
v.
A.P. EASON, Jr.; Rex A. Smith; J.F. Robinson; J. Warren
Murray; Joe A. Upchurch, Defendants,
Delbert A. Allen, Appellant,
James E. Shreve, Defendant.
RESOLUTION TRUST CORPORATION, Appellee,
v.
A.P. EASON, Jr.; Rex A. Smith; J.F. Robinson; J. Warren
Murray; Joe A. Upchurch, Appellants,
Delbert A. Allen; James E. Shreve, Defendants.
 Nos. 93-2185, 93-2264 and 93-2266.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1993.
Decided March 3, 1994.
 
 Counsel who presented argument on behalf of the appellant was Lance Stockwell, Tulsa Oklahoma, for RTC. Additional attorneys appearing on the brief were Bradley K. Beasley and Sheila M. Powers, Tulsa OK, Lavenski R. Smith, Springdale, AR, Neysa Day, Overland Park, KS.
 Counsel who presented argument on behalf of the appellee was William J. Butt, II, Fayetteville, for appellees Eason, Smith, Robinson, Murry and Upchurch and Matthew T. Horan, Fort Smith, AR, for appellee Allen.
 Before MAGILL, Circuit Judge, BRIGHT, Senior Circuit Judge, and BEAM, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Resolution Trust Corporation (RTC) brought this jury action seeking damages in the sum of $12 million against officers and directors (Officers) of the failed First Federal Savings and Loan Association of Fayetteville, Arkansas (First Federal) alleging negligence and breach of fiduciary duty in approving loans that later failed. The jury denied recovery and RTC appeals from a judgment of dismissal. The Officers cross-appeal from the district court's post-trial order denying attorney's fees. We reject both appeals and affirm.
 
 
 2
 In its appeal, RTC contends that the district court erred in (1) admitting into evidence two unauthenticated documents which contained hearsay; (2) instructing the jury on custom and usage in the savings and loan industry; and (3) instructing the jury on the business judgment rule, and then erroneously stating the rule's content.
 
 I. BACKGROUND
 
 3
 RTC named bank officer Eason and directors Smith, Robinson, Murray, Upchurch and Allen as defendants. Eason founded First Federal in 1953, and operated the S & L as its president until the institution failed in 1989. Smith, Robinson, Murray, Upchurch and Allen served on First Federal's Board of Directors during the early 1980s, when the challenged loans were made.
 
 
 4
 Between 1982 and 1984 First Federal made $25 million in "participation loans". A financial institution makes (or "purchases") a participation loan when it agrees to join other institutions in a large loan transaction, with each institution contributing part of the total loan. Typically, a borrower approaches one S & L for the entire loan, and that S & L, referred to as the "lead lender", attempts to find other institutions to become participants.
 
 
 5
 First Federal's participation loans were made to borrowers seeking tens of millions of dollars to build large-scale commercial real estate projects. First Federal typically loaned between $500,000 and $2 million toward these projects, and other S & Ls participated in varying amounts to meet the borrowers' needs.
 
 
 6
 RTC challenges eleven failed loans which allegedly resulted in losses to First Federal of approximately $12 million. RTC concedes that the Officers did not err in deciding to enter the risky business of participation loans, but contends that the manner in which the Officers underwrote those loans constituted negligence and a breach of fiduciary duty. In the S & L industry "underwriting" refers to the process by which a financial institution determines the likelihood of repayment for a potential loan.
 
 
 7
 Generally, First Federal entered into the challenged participation loans in the following way.[1] A lead lender, usually an S & L in the state where the borrower intended to build the project, would send First Federal's loan officers written information about the proposed construction. Eason and two of his top employees would review the material from the lead lender, which typically included financial statements and other pertinent information about the borrower, along with details about the total cost of the project and the extent of participation sought. Sometimes a First Federal employee, as part of the loan evaluation, would visit the community in which the construction would take place. More often, however, Eason evaluated the participation opportunity on the basis of the information provided by the lead lender and his own personal knowledge of the lead lender, the loan broker, or the other participants.
 
 
 8
 In evaluating participations Eason also relied on the presence of "take-out" commitments, which are promises made by one participating S & L committing that S & L to paying off all the other participants if the original borrower fails to do so. With respect to the challenged loans, the take-out lender would typically commit to paying off the other participants eighteen months after the project began. Eason favored participations with take-out commitments, reasoning that the presence of a take-out lender reduced the investment's risk. Again Eason relied solely on the lead lender's assessment of the reliability of the take-out commitment, and conducted no independent investigation concerning the financial soundness of the take-out lender.
 
 
 9
 Eason rejected some proposals on the basis of the information provided by the lead lenders. Proposals not rejected came to First Federal's Board of Directors for approval. The Board reviewed Eason's presentations and ultimately gave approval to all of the projects which were brought before it.
 
 
 10
 Some of First Federal's participations fared well, resulting in full and prompt repayment at a high rate of interest. As noted, eleven loans challenged by RTC produced losses. In some cases these loans were a total loss; in others First Federal sued the borrower or the take-out lender and recovered a portion of its investment.
 
 
 11
 After First Federal went bankrupt in 1989, the Office of Thrift Supervision (OTS) appointed RTC as receiver. Prior to bringing this action, RTC in its corporate capacity purchased from RTC as receiver the "right" to assert the negligence and breach of fiduciary duty claims against the Officers.
 
 
 12
 At trial, the parties hotly disputed the adequacy of First Federal's underwriting. RTC asserted that First Federal's underwriting included no "verification", that is, no attempt to ensure the accuracy of the financial information provided to First Federal about the borrower. The Officers responded in defense that they had relied justifiably on the lead lenders to perform the process of verification, and that they never had been criticized for this practice with respect to numerous smaller-scale in-state loan participations purchased during the 1970s. Each side presented evidence, expert witnesses and others, to support their respective contentions.
 
 
 13
 The Officers also introduced evidence that in 1983 a Federal Home Loan Bank Board (FHLBB) examiner gave First Federal's underwriting a letter grade of "B" (on an A to F scale), and answered "Yes" to the question "Are underwriting standards for loan commitments adequate?". Tr. at 577-79, Exhibits 78 and 79. In addition, two workpapers of an FHLBB examiner admitted into evidence over RTC's objection contained the handwritten comment "excellent investment" relating to each of two of the challenged loans. Tr. at 514-16, Exhibits 76 and 77.
 
 
 14
 At the close of RTC's evidence, the Officers moved for judgment as a matter of law. The district court denied this motion. The district court instructed the jury on the applicable Arkansas law of negligence and breach of fiduciary duty. The trial court also instructed the jury on the business judgment rule, and on custom and usage in the S & L industry.
 
 
 15
 The court gave the jury twelve interrogatories applicable to each of the eleven loans in question. The jury answered "no" to the interrogatories relating to the liability of defendants on each of the loans and the trial judge entered a judgment of dismissal. RTC then moved for a new trial on the same grounds presented in this appeal. The district court denied RTC's motion, and also denied the Officers' subsequent motion for attorney's fees.
 
 
 16
 We now turn to RTC's appeal.
 
 II. DISCUSSION
 A. The Handwritten Notes
 
 17
 During the cross-examination of Eason, the defendants sought to introduce into evidence two FHLBB documents, one relating to the Eagleridge loan and the other to the Century Park loan. Before defendants' counsel offered the documents, Eason testified (1) that in 1983 the FHLBB Examiner-in-Charge complimented the S & L on its documentation of loan participations; (2) that examiners often made longhand written notes on examination documents; and (3) that Eason had seen the "federal exam workpapers" on the Eagleridge and Century Park loans. Defendants' counsel then offered the workpapers, each of which contained the handwritten notation "excellent investment." RTC's counsel objected, stating that the notes
 
 
 18
 were prepared ... by ... one of the staff people who [examined] the loan, and he simply [examined] the terms of the loan, and then he called it an excellent investment and put down a percentage that there was a return that was coming on it. We do not know if this particular individual did any underwriting examination of it.... And so as a result, it is hearsay in the opinion of some staff person who we don't know the nature or extent of the work that he did.
 
 
 19
 Trial Tr. at 514. Before ruling on the objection, the trial court initiated the following colloquy, which applied to both exhibits:
 
 
 20
 THE COURT: Wasn't it made, though, that he was an employee of the examining agency and wasn't it made in the course of his duties?
 
 
 21
 MR. STOCKWELL [RTC's counsel]: It was made in the course of his duties, but I don't know that his duties involved the analysis of underwriting, because that's what the notes reflect--that's not what the notes reflect. And I have no way to cross examine him--He is not here--to know why he wrote that down.
 
 
 22
 THE COURT: All right. The objection is overruled. I think it's admissible.
 
 
 23
 Trial Tr. at 514-15. The district court thereupon admitted the workpapers as Exhibits 76 and 77.
 
 
 24
 RTC appeals the district court's decision to admit the workpapers on three grounds--lack of authentication (Fed.R.Evid. 901), hearsay (Fed.R.Evid. 803), and undue prejudice (Fed.R.Evid. 403).[2] " 'A trial court's ruling concerning the admissibility of evidence can be reversed only upon showing that a clear abuse of discretion has occurred.' " Campbell v. Gregory, 867 F.2d 1146, 1147 (8th Cir.1989) (quoting Hoover v. Thompson, 787 F.2d 449, 450 (8th Cir.1986)).
 
 
 25
 In rejecting the RTC's motion for new trial, the district court made the following observations concerning the questioned exhibits:
 
 
 26
 The court also rejects plaintiff's contention that the admission of defense exhibits 76 and 77 was improper. The exhibits in question were produced during discovery by the plaintiff and were represented to be true and accurate copies of the examination reports. As such, the court believes the exhibits were admissible as business records. Further, as defendants point out Mr. Eason had already testified regarding the remarks of the examiner. Even if the court believed its evidentiary ruling with respect to these exhibits was in error, which it does not, the court would not grant a new trial. The admission of these exhibits, even if erroneous, was not so prejudicial as to require a new trial.
 
 
 27
 Appellant's App. at 25 (Order of Apr. 6, 1993) (emphasis added).
 
 
 28
 We agree with the district court. First, RTC's authentication objection lacks merit. Counsel for RTC conceded the genuineness of these two exhibits, satisfying the authentication requirement of Fed.R.Evid. 901.
 
 
 29
 Second, the statement of RTC's counsel at the bench conference and other evidence established a foundation sufficient, although barely so, to support admissibility of the exhibits under Fed.R.Evid. 803(6).[3] RTC's counsel conceded the notes were prepared by a member of the FHLBB staff "in the course of his duties," although counsel added that he did not know whether "his duties involved the analysis of underwriting." Trial Tr. at 514. Other testimony, however, indicated examiners made handwritten notes in the course of their examination of records. Moreover, the exhibits showing that the FHLBB graded highly First Federal's underwriting demonstrated that the examiner did review underwriting practices as part of his job. The evidence plus statements by RTC's counsel established that the workpapers containing the "excellent investment" notations had been made (and kept) in the course of a regularly conducted activity, as part of the FHLBB's regular practice of examining thrift institutions.
 
 
 30
 Nothing in the record indicates that Exhibits 76 and 77 were untrustworthy, or that Eason could not furnish some background information to help establish the exhibits as business records. See 4 Weinstein's Evidence Sec. 803(6), p. 803-178 (1993) ("phrase 'other qualified witness' [in Rule 803(6) ] should be given the broadest interpretation ..."). As long as the other requirements of the business records exception are met, a custodian or "other qualified witness" need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information. United States v. Franks, 939 F.2d 600, 602 (8th Cir.1991).
 
 
 31
 Third, RTC's Fed.R.Evid. 403 objection that the risk of unfair prejudice to RTC substantially outweighed the probative value of the exhibits first should have been presented to the district court. We decline, therefore, to address that contention.
 
 
 32
 Finally, given the volume of evidence presented to the jury during the six-day trial, the introduction of these exhibits amounted at worst to harmless error. Accordingly, notwithstanding the sparse and somewhat questionable foundation, we will not overturn the judgment on this evidentiary issue.[4]
 
 B. Jury Instructions
 
 33
 RTC contends that the evidence in the record did not warrant jury instructions on custom and usage in the S & L industry (Instruction 12) and the business judgment rule (Instruction 16). RTC also contends that the district court erred in stating the contents of the business judgment rule.
 
 
 34
 A district court has broad discretion to frame jury instructions and "as long as the entire charge fairly and adequately contains the law applicable to the case, the judgment will not be disturbed on appeal." City of Malden, Mo. v. Union Elec. Co., 887 F.2d 157, 163 (8th Cir.1989). We first consider whether the Officers introduced sufficient evidence to warrant the instruction on industry custom.
 
 
 35
 The district court's instruction on custom and usage read:
 
 
 36
 In deciding whether the defendants were negligent in the performance of their duties to [First Federal], conformity to the customs and practices of others engaged in the management and administration of similar savings and loan associations can be considered by you. However, conformity to the customs or practices of others in the industry is not conclusive on the issue of negligence. An industry wide custom or practice may itself be unreasonable or unwise under the circumstances.
 
 
 37
 In order to establish a custom or practice of an industry, the custom or practice must be shown to have been uniform, definite, and have been in existence long enough for it to have become generally known.
 
 
 38
 Instruction 12, Tr. at 1274. The RTC contends that the Officers failed to adduce sufficient evidence establishing the uniform existence of an industry custom to which the Officers' conduct could be compared. The record indicates that the Officers introduced enough evidence to warrant the instruction.
 
 
 39
 Eason testified that First Federal relied on lead lenders in making its in-state loan participations during the 1970s. Tr. at 172-73. The FHLBB had not questioned this practice. Allen, a First Federal board member and lifetime banking professional, testified to his understanding that S & Ls customarily relied on the accuracy of lead lenders' information, both in Arkansas and nationally. Tr. at 606. Allen also testified that the bank he operated relied on lead lenders to verify financial information submitted in support of participation proposals. Again, a jury could reasonably infer from this testimony that First Federal did nothing unusual in relying on lead lenders.
 
 
 40
 The Officers also introduced two pieces of strong tangible evidence which further supported the instruction on custom and usage: (1) a Notice of Proposed Rulemaking from 1986 in which the FHLBB proposed to codify its approval of the practice of relying on the lead lender, Exhibit 67; and (2) the grade of "B" given to First Federal's underwriting practices in 1983 by the FHLBB. This evidence suggests that the Officers followed customary underwriting practices that had been found acceptable to the FHLBB. In addition, the court fairly placed the issue before the jury with the neutral and conditional language of the instruction, requiring sufficient evidence of an industry custom before considering custom and usage on the question of liability.
 
 
 41
 We reach the same conclusion concerning the district court's instruction on the business judgment rule.[5] To invoke the rule, directors must show (1) that they were disinterested and that their conduct otherwise met the test of business judgment, and (2) that they informed themselves of all material information reasonably available to them before making a business decision, and having become so informed, acted with requisite care in discharging their duties. Hall v. Staha, 303 Ark. 673, 800 S.W.2d 396, 399 (1990). After carefully reviewing the record we determine that the Officers introduced enough evidence concerning their underwriting practices to justify the instruction.
 
 
 42
 Moreover, Instruction 16 did not demand that the jury apply the rebuttable presumption of the business judgment rule, but instead permitted the jury to apply the presumption only "if " the jury found from a preponderance of the evidence that the defendants fully informed themselves of all pertinent material. While "[t]he assumption of a disputed fact in a jury instruction is prejudicial error", Weatherford v. Wommack, 298 Ark. 274, 766 S.W.2d 922, 924 (1989), the conditional language of the instruction required the jury to resolve the core factual issue of whether the Officers adequately informed themselves before applying the presumption in the Officers' favor.
 
 
 43
 Next we consider RTC's contention that the district court's instruction on the business judgment rule contained ambiguous and inconsistent language. The Arkansas Supreme Court mandates that to invoke the protection of the business judgment rule, "directors have a duty to inform themselves of all material information reasonably available to them prior to making a business decision." Hall v. Staha, 303 Ark. 673, 800 S.W.2d 396, 399 (1990). Instruction 16 tracked verbatim this critical language from Hall and comes within the rule that "there is no entitlement to any particular language in an instruction." May v. Arkansas Forestry Commission, 993 F.2d 632, 637 (8th Cir.1993). The district court did not misstate the content of the Arkansas business judgment rule.
 
 
 44
 We affirm the district court on the RTC's appeal, and now turn to the Officers' cross-appeal.
 
 III. OFFICERS' CROSS-APPEAL
 
 45
 The Officers allege that the district court improperly denied their motion for attorney's fees based on the Equal Access to Justice Act (EAJA), which states:
 
 
 46
 Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys ... to the prevailing party in any civil action brought by or against the United States or any agency ... of the United States.... The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.
 
 
 47
 28 U.S.C. Sec. 2412(b) (1988).
 
 
 48
 We will reverse a district court's decision to award attorney's fees under EAJA only for an abuse of discretion. SEC v. Comserv Corp., 908 F.2d 1407, 1411 (8th Cir.1990). "In applying this standard, we review the district court's conclusions of law de novo, and reject its findings of fact only if clearly erroneous." Id.
 
 
 49
 Section 2412 operates as a limited waiver of the United States' sovereign immunity by permitting courts to award reasonable attorney's fees to the prevailing party in any civil action brought by or against the federal government. Waivers of sovereign immunity under Sec. 2412(b) "must be strictly construed in the government's favor." Premachandra v. Mitts, 753 F.2d 635, 641 (8th Cir.1985). The question we face is whether the Officers, having prevailed on the merits, are entitled to attorney's fees from RTC under this section.[6]
 
 
 50
 The Officers contend that when RTC in its corporate capacity acquired certain assets of First Federal, including the right to bring the claims raised in this action, RTC stood in the shoes of First Federal for purposes of this lawsuit. Thus, the argument goes, the district court erred in not holding RTC liable for attorney's fees to the same extent that First Federal would have been had First Federal brought the case. The Officers assert that First Federal would have been liable to the prevailing defendants under 12 C.F.R. Sec. 545.121 (1989)[7], which mandates that financial associations indemnify directors for attorney's fees when directors prevail across the board on the merits of any lawsuit challenging their conduct on behalf of the financial institution.
 
 
 51
 The district court denied the Officers' motion for attorney's fees, concluding that 12 C.F.R. Sec. 545.121 "does not provide a statutory basis for an award of fees and expenses under EAJA." The district court reasoned:
 
 
 52
 Section 545.121 is merely a provision which delineates the circumstances under which a regulated savings and loan association is required or permitted to indemnify its officers and directors. The regulation itself states that it is subject to and qualified by the right of the RTC to hold directors and officers personally liable.
 
 
 53
 District Court's Letter resolving motions for fees and costs (4/26/93) at 7.
 
 
 54
 We agree with the district court. Section 545.121 clearly contemplates that the "association" furnishing indemnification must itself be a going concern. For example, where an officer wins final judgment other than on the merits, an association must provide indemnification only if:
 
 
 55
 a majority of the disinterested directors of the association determine that [the officer] was acting in good faith within the scope of his employment or authority as he could reasonably have perceived it under the circumstances and for a purpose he could reasonably have believed under the circumstances was in the best interests of the association or its members. However, no indemnification shall be made unless the association gives the Board at least 60 days' notice of its intention to make such indemnification.
 
 
 56
 12 C.F.R. Sec. 545.121(c)(2)(iii). Further, Sec. 545.121(e) provides for advance payment of costs and attorney's fees subject to the majority approval of the board. These provisions assume the existence of an ongoing institution with a working board of directors. We conclude that as to a claim for attorney's fees against RTC the regulation as a whole applies only during the life of the indemnifying association or the life of its "legal representatives, successors, and assigns." See 12 C.F.R. Sec. 545.121(a)(2).
 
 
 57
 Importantly, by the time RTC instituted this suit, First Federal had long since failed and no longer had a board of directors. Further, RTC made no attempt to carry on the thrift's business; the corporation has sought only to resolve the bankrupt institution pursuant to its authority under 12 U.S.C. Sec. 1441a(b)(3). We are unconvinced that RTC became a legal successor to, or assignee of, First Federal with respect to indemnification obligations under 12 C.F.R. Sec. 545.121, because the indemnification "liability" did not even exist when the OTS appointed RTC as First Federal's receiver. During the existence of the thrift association, First Federal never initiated legal action against the Officers, and thus incurred no indemnification liability.
 
 
 58
 The Officers cite Harris v. Resolution Trust Corporation, 939 F.2d 926 (11th Cir.1991), for the proposition that 12 C.F.R. Sec. 545.121 imposes the same indemnification liability on RTC as on the thrift institution itself. Harris, in our view, adds little force to the Officers' position.
 
 
 59
 Prior to Harris' suit against RTC, the government indicted him for conspiring to obtain a seat on Community Federal of Tampa's board of directors, and for fraudulently making a false entry in the board's minutes. The jury acquitted Harris on the false entry charge, but could not reach a verdict on the conspiracy count. Harris then made a demand on Community Federal's board for mandatory indemnification under Sec. 545.121, claiming he had won final judgment on the merits of the action. The board refused to indemnify Harris, who then sued RTC, which by this time had become receiver for Community Federal.
 
 
 60
 The Eleventh Circuit affirmed the trial court's judgment denying mandatory indemnification under Sec. 545.121 on the ground that Harris had not won an across the board victory, noting the hung jury on the conspiracy count. 939 F.2d at 928-29. The holding in Harris thus provides no support for the Officers' claim in the instant case. The statement in Harris suggesting that the court would have compelled the RTC to indemnify Harris had he won on both counts amounts to dictum only. More importantly, Harris sheds no light on whether Sec. 545.121 applies to a defunct thrift with no working board. To the contrary, Harris made his demand for indemnification against an active corporation and a working board of directors.
 
 
 61
 Absent more explicit language in Sec. 545.121, we reject the Officers' claim for indemnification.[8] Accordingly, we determine that the district court did not err in denying attorney's fees to the Officers.
 
 IV. CONCLUSION
 
 62
 Finding no error in any of the challenged rulings, we affirm the judgment of the district court.[9]
 
 
 
 [1]
 Minor distinctions in the loans do not affect our consideration of the totality of loans in this appeal
 
 
 [2]
 While at trial RTC's counsel did not deny the genuineness of the document as a government record prepared by an FHLBB examiner, the RTC added lack of authentication as a further ground for inadmissibility in its post-trial motion. On appeal, RTC adds another new ground of error, namely that the written comments operated to unfairly prejudice RTC and should have been excluded under Fed.R.Evid. 403
 
 
 [3]
 Rule 803(6) of the Federal Rules of Evidence reads:
 (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 We note in passing that the Officers did not necessarily introduce the workpapers to prove that the Eagleridge and Century Park loans were in fact "excellent investments". The Officers could have offered the workpapers for the non-hearsay purposes of (1) showing the examiner's state of mind at the time of the exam, (2) supporting Eason's claims that the examiners stated to Officers that the S & L loan practices were proper; and (3) that the Officers had no reason to believe the FHLBB considered First Federal's lending practices unsafe, unsound, or unusual (Officers' state of mind).
 
 
 [4]
 The objection that the exhibits did not intend to address any matter other than the interest rate, not the propriety of the underwriting, might have received clarification by an instruction under Fed.R.Evid. 105, but neither party requested such an instruction on limited admissibility
 
 
 [5]
 The instruction read:
 The defendants contend that they are not liable for any losses resulting from the loans in question because their acts and decisions were protected by the "business judgment rule."
 The "business judgment rule" is a presumption that in making a business decision the directors or officers of a corporation acted on an informed basis, in good faith, and in an honest belief that the action taken was in the best interest of the company. This rule is based on the assumption that the directors or officers of the corporation are better equipped than the Court or the jury to make business judgments or decisions.
 A director or officer may rely on the protections of the "business judgment rule" if:
 
 
 [1]
 The director or officer is disinterested and has acted in good faith. The term "disinterested" means that the director or officer must not be personally interested, financially or otherwise, in the transaction at issue; and
 
 
 [2]
 The director or officer had fulfilled his duty to inform himself of all material information reasonably available to him prior to making the business decision
 You are instructed that in this case, the plaintiff does not contend that defendants were personally interested, financially or otherwise, in any of the loans which are the subject matter of this lawsuit or that they acted in bad faith. Thus, if you find from a preponderance of the evidence that a defendant has met the requirements set forth in sub-paragraph 2 above, your verdict shall be for such defendant unless you find that the plaintiff has rebutted the presumption created by the business judgment rule by showing that no person with ordinary, sound business judgment would have, as an officer or director of the corporation, assented to the action taken.
 Instruction 16, Tr. at 1276-77.
 
 
 [6]
 Section 2412(b) renders the United States liable for attorney's fees to the same extent that any other party would be liable "under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. Sec. 2412(b) (emphasis added). We have held that the underlying provisions referred to in Sec. 2412(b) must be federal, that is, federal common law or a federal statute. Olson v. Norman, 830 F.2d 811, 822 (8th Cir.1987) ("We do not read Sec. 2412(b) to subject the United States to liability for attorneys' fees based on state laws, be they statutory or common"). To the extent that the Officers continue to raise underlying state law provisions, we reject these contentions based on Olson
 
 
 [7]
 This regulation reads:
 A Federal association shall indemnify its directors, officers, and employees in accordance with the following requirements:
 ....
 (b) General. Subject to paragraph (c) of this section, an association shall indemnify any person against whom an action is brought or threatened because that person is or was a director, officer, or employee of the association, for:
 (1) Any amount for which that person becomes liable under a judgment in such action; and
 (2) Reasonable costs and expenses, including reasonable attorney's fees, actually paid or incurred by that person in defending or settling such action, or in enforcing his rights under this section if he attains a favorable judgment in such enforcement action.
 (c) Requirements. Indemnification shall be made to such person under paragraph (b) of this section only if:
 (1) Final judgment on the merits is in his favor; ...
 
 
 [12]
 C.F.R. Sec. 545.121
 For purposes of this litigation we assume that such regulation incorporates common law indemnity in the federal law or that the regulation serves to impose a federal statutory liability for indemnification.
 
 
 [8]
 Cf. Adams v. RTC, 831 F.Supp. 1471, 1478-79 (D.Minn.1993) (reading 12 C.F.R. Sec. 545.121(g) in conjunction with 12 U.S.C. Sec. 1821(k), indemnification unavailable from RTC when it sues directors for wrongful conduct against financial institution)
 
 
 [9]
 The Officers' cross-appeal asserts that the district court erred in denying its motion for judgment as a matter of law made after the close of the RTC's evidence. Our affirmance moots that issue