# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1161

_____

Terry Campbell,                              *
                                             *
            Plaintiff - Appellee,            *
                                             *
    v.                                       *
                                             *
Arkansas Department of Correction,           *
An Agency for the State of Arkansas;         *
Larry Norris, Personally and in his          *
Official Capacity as Director of             *
Arkansas Department of Correction;           *  Appeal from the United States
G. David Guntharp, Personally and in         *  District Court for the
his Official Capacity as Assistant           *  Eastern District of Arkansas.
Director of Arkansas Department of           *
Correction;                                  *
                                             *
            Defendants - Appellants,         *
                                             *
Jane Manning, Personally and in her          *
Official Capacity as Equal Employment        *
Opportunity Grievance Officer,               *
                                             *
            Defendant.                        *

_____

Submitted: June 8, 1998
Filed: August 28, 1998

_____

Before WOLLMAN and MURPHY, Circuit Judges, and FENNER,[1] District Judge.

_____

MURPHY, Circuit Judge.

Terry Campbell, a career employee of the Arkansas Department of Correction, was demoted from his position as warden of the state maximum security unit after he spoke out about corruption and lack of security in the institution. He sued the department and several of its officials under 42 U.S.C. § 1983 and Ark. Code Ann. § 16-123-105 (Michie 1997), alleging that he had been transferred because of his criticisms in violation of his free speech and due process rights. A jury found in favor of Campbell and awarded him $94,000 in damages, and the district court[2] ordered equitable relief in the form of reinstatement or $74,000 in front pay and elimination of his one year probation. The defendants appeal from the judgment, and we affirm except as to the equitable part of the award.

**I.**

On appeal from a jury verdict, the facts must be stated in the light most favorable to the prevailing party and he must receive the benefit of all reasonable inferences from the evidence at trial. See Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir.), cert. denied, 117 S.Ct. 2510 (1997).

Terry Campbell was employed in the Arkansas state prison system for seventeen years prior to his appointment as warden of the Tucker Maximum Security Unit on

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, sitting by designation.

[2]The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

September 20, 1994. The prison system had a number of separate correctional institutions, and the Tucker Unit contained the system's death row, as well as inmates who had been placed in administrative segregation due to violent behavior. Campbell had begun his career as a correctional sergeant and had worked his way up to be warden of the Varner Unit by 1993. The Varner Unit housed a younger population and some maximum security inmates and featured education and vocational programs. The Director of the Arkansas Department of Correction (ADC) was Larry Norris. Assistant Director G. David Guntharp reported directly to Norris, and he was the official who appointed Campbell warden at Tucker.

Guntharp had consistently given Campbell high annual performance evaluation ratings, and part of the reason he offered him the Tucker position was because he believed Campbell was strong on policy. Campbell was regarded by others in the system as meticulous in his implementation of ADC policies and procedures. The previous warden at Tucker had been demoted for leaving the institution to gamble while on duty, and the prison had been run in the interim by Tom Pitts, the assistant warden. Guntharp encouraged Campbell to accept the appointment as an opportunity to broaden his warden experience. From the time of his appointment in September, Campbell spent one day a week at Tucker and moved there from Varner full time in January 1995.

When Campbell arrived at Tucker he was faced with morale and turnover problems and numerous vacant staff positions. He saw that changes needed to be made, and he set about interviewing Tucker personnel, reviewing existing policies and procedures, and investigating how money came to be missing from the Employee Corporation Fund. Illegal contraband was moving into and within the prison so he instituted policies to search all staff, including himself, upon entry to death row and to conduct random searches of inmate cells. He also updated the orders and duties associated with each officer's post. Through his investigation he learned there were security breaches at Tucker, including unlocked cell doors, overheated control panels

for cell door operation, and cell doors which had been altered so that inmates were able to open them. He reported these conditions, and the steps he had taken in response, to Guntharp and Norris. He also submitted recommendations on how to correct the problems with cell doors and sought a hazardous pay increase for Tucker employees and additional security equipment.

Campbell ordered a "shakedown" for February 14, 1995, which is a comprehensive search of inmate cells. The shakedown revealed there was contraband on the death row complex at Tucker. The contraband included hammers, chisels, shanks, gunpowder, hacksaw blades, wire cutters, glass jars, exacto knives, civilian clothes, marijuana, syringes, paint thinner, and photographs of inmates cohabitating. The search also discovered cell windows which were being enlarged to permit escape and a missing cinder block adjoining two cells. It was undisputed at trial that the contraband had been introduced before Campbell took over full time as warden of the maximum security unit.

Intense media attention followed the discovery of the death row contraband. Campbell believed that Guntharp and Norris blamed him for the attention, but he testified at trial that he had not initiated any media contact. On one occasion Guntharp criticized Campbell for the way the contraband had been displayed and photographed before it was disposed of, commenting that the display looked like it was intended for a media photo opportunity. Norris was subsequently asked to testify before a subcommittee of the state legislature about the contraband discovered in the unit.

Several months later, on June 9, 1995, Campbell terminated assistant warden Pitts for breaches of security, falsification of information, and unsatisfactory work performance. During the time the position of warden was vacant, Pitts had been the top official at Tucker and much of the contraband could have been introduced during this period. Pitts filed a grievance challenging his termination, and Campbell testified at the Pitts hearing on November 1, 1995 that the action had been taken on the

recommendation of ADC Assistant Director Guntharp and Director Norris. During a meeting in October 1995 with Guntharp, Norris, and an ADC attorney, Campbell had commented that Guntharp and Norris had instructed him to fire Pitts while they were together in a June 6 meeting about contraband and an alleged rape of a death row inmate. He testified at the trial in this case that Norris and Guntharp had objected to this comment and that Norris had become very angry. Sometime after the Pitts hearing, Campbell learned that Guntharp and Norris had both testified there that they had not authorized Pitts' termination. Campbell became concerned about possible repercussions due to the conflict in their testimony and to their reactions at the October meeting.

Shortly before his demotion in January of 1996, Campbell was appointed to a Critical Incident Review Committee (CIRC) which had been established to conduct an internal review of the November 15, 1995 murder of Scott Grimes, a guard in the administrative segregation barracks at Tucker. Grimes had been fatally stabbed by an inmate who had escaped from his cell after tampering with the cell door. Long before the killing of Grimes, Campbell had brought the problem with cell doors to the attention of Guntharp and Norris. One instance was after another inmate had escaped in the same manner in January of 1995. Guntharp did not proceed with a program to alter the doors to prevent escape until after Grimes' murder, however. At the first CIRC meeting Campbell announced his intention to discuss his concerns about the cell doors and other security issues at Tucker. Campbell was unable to do so, however, because he was demoted and transferred on the day that the next CIRC meeting was scheduled to take place. The CIRC never made a recommendation to management concerning defective cell doors, although it did look into cell door maintenance at Tucker as part of its review.

On several occasions before Campbell's demotion and transfer, Guntharp and Norris complained to him about the amount of media attention the maximum security unit was receiving and the pressure on them from the governor's office and the state

legislature to do something about it. After the contraband was discovered, Campbell was sought out for interviews. He referred the requests to the ADC public information officer, and one interview was approved. Guntharp instructed him "to be pretty goddamned careful" about what he said to the media, not to "volunteer anything," and "to keep it simple" because he and Norris did not want "any of this coming out right now." Both Guntharp and Norris told Campbell on several occasions that the ADC was getting negative publicity and that they wanted him to keep the media out of Tucker while the unit was being cleaned up. During the time that the media attention was especially intense, Norris and Guntharp regularly discussed the public scrutiny and negative publicity at management team meetings. Campbell testified that he was afraid he would be fired if he ever spoke to a member of the press. When he discovered a jar of flammable liquid in one of the cells on death row in December 1995, he notified Guntharp about it and said that he was trying to find the source. Guntharp called Campbell into his office and told him he was overreacting to the discovery. He also told him that he needed to get the media out of Tucker and that "the director and myself are catching a lot of media flak and the governor's office is on us also."

On January 17, 1996, Guntharp called Campbell into his office and notified him that he was being reassigned to be assistant warden of the Varner Unit. Campbell had previously been warden at Varner, and Guntharp explained that a management decision had been made to demote him and cut his salary by eight percent. Guntharp stated that the action was not a disciplinary matter arising under the ADC Administrative Regulation 225 (AR 225). This regulation contains employee conduct standards for the ADC and progressive disciplinary steps that can be taken if the standards are violated. Campbell testified at trial that he had never heard of a demotion at the ADC unless it involved AR 225. Guntharp admitted at trial that no progressive action had been taken against Campbell before he was demoted. A transcript of the meeting at which Guntharp informed Campbell of his demotion and transfer reveals that Guntharp criticized him at this meeting for being unable to keep the media out of Tucker. After the meeting, however, Guntharp sent Campbell a memo stating that he had "lost the

-6-

rapport and support of the staff" necessary for the successful operation of Tucker and that he was being transferred for his "own health and safety and the health and safety of the staff."

Campbell filed a grievance in February challenging his demotion and transfer as a "form of retaliation" and alleging that he should have been disciplined under AR 225 before being demoted. He was informed by Jane Manning, the ADC Grievance Officer, that the same grievance procedure available in AR 225 cases would apply to him. Nine days after the grievance was filed, Guntharp sent a memorandum to Norris, outlining a history of problems Guntharp claimed he had had with Campbell's management skills in various positions with the ADC beginning in 1990. Norris admitted at trial that he had been informed in advance about Guntharp's decision to transfer Campbell and that he had given his approval. Campbell did not receive a copy of Guntharp's February memorandum until the grievance hearing on May 15, 1996. Guntharp had never mentioned to him any of the complaints listed in the memo, and neither the memo nor Guntharp's related notes were ever placed in Campbell's personnel file.

Campbell's grievance hearing on May 15 was conducted by Director Norris even though he had been actively involved in some of the underlying events. He had firsthand knowledge of Campbell's actions as warden of Tucker, had himself expressed concerns about negative publicity concerning the conditions at Tucker, had exhibited a difference with Campbell over testimony at the Pitts hearing, and had been informed about and approved Guntharp's demotion decision in advance. Campbell objected to Norris acting as hearing officer and requested a panel hearing instead, but his request was denied. Campbell testified that he then told Jane Manning that he might call Norris as a witness. She said she would look into whether Norris would be able to testify as well as hear the grievance, but she never got back to Campbell. Campbell notified Norris at the outset of the hearing that he wanted to call him as a witness, but Norris said he could not testify since he was presiding.

At the hearing Campbell claimed that there had been no appropriate basis for his demotion, that the action taken against him did not conform to AR 225, and that he was being unfairly blamed for the conditions at Tucker and retaliated against for calling attention to them and for his testimony at the Pitts hearing. He sought reinstatement and back pay. Campbell was represented by counsel, and the hearing lasted approximately two hours. Campbell and Guntharp both testified,[3] but the transcript does not show that they were sworn to tell the truth. Campbell was unable to subpoena additional witnesses. Five exhibits were introduced, including Guntharp's February memo. Norris did not state any decision at the hearing, but he wrote a four paragraph letter to Campbell six days later on May 21. In the letter Norris stated that he understood Campbell's claim to be that he had been demoted in retaliation for uncovering contraband evidence and other security lapses while he was warden at Tucker. Norris said he had seen no evidence of retaliation and was "compelled to uphold Mr. Guntharp's decision" which he believed was "correct."

After Campbell was demoted to assistant warden of the Varner Unit, warden Rick Toney gave him a performance evaluation of 300 for 1996. Campbell questioned it, and Toney raised it by ninety four points, which was still six points below the rating needed for a one and a half percent pay increase. Two employees were featured anonymously on the local news in March 1997 after a gang riot at Varner. They were critical of the ADC administration, and Guntharp asked Toney to find out who they were. Meanwhile, Campbell arranged a meeting with Norris and an ADC attorney to discuss concerns he had about security at Varner. When Toney learned in August 1997 that Campbell had criticized him at the meeting, he placed Campbell on one year probation for not following the chain of command even though Campbell had given Toney advance notice of the meeting. Toney also commented that Campbell's

---

[3]Manning also testified briefly, but she declined to comment on the underlying facts. According to ADC policy the grievance officer could only be called to testify if she had "caused the action, ha[d] direct first party knowledge of the action, or witnesse[d] the action which [was] the subject of the matter being grieved."

criticisms were similar to those that had been expressed anonymously on the local news.

## II.

Campbell brought this action, under 42 U.S.C. § 1983 and Ark. Code Ann. § 16-123-105,[4] approximately one month after Norris wrote the letter denying his grievance. Campbell sued the ADC, Norris, Guntharp, and Manning, alleging that his demotion and transfer violated his constitutional rights to freedom of expression and due process and entitled him to compensatory and punitive damages and injunctive relief.[5] The defendants moved for summary judgment on the merits of the claims and asserted absolute immunity under the eleventh amendment. Norris, Guntharp, and Manning also claimed qualified immunity in their individual capacities. The district court did not grant qualified immunity because of a disputed issue of material fact as to whether Campbell had been demoted in retaliation for commenting on issues of public concern, but it did grant eleventh amendment immunity to the ADC. Eleventh amendment immunity was denied on the claims for injunctive relief against the individual defendants in their official capacities.

---

[4]Arkansas Code § 16-123-105 is modeled on 42 U.S.C. § 1983 and is to be construed consistently with the federal statute. See Ark. Code Ann. § 16-123-105(c). It permits suits for violations under color of state or local law of "any rights, privileges, or immunities secured by the Arkansas Constitution." Id. § 16-123-105(a).

[5]Campbell also pled a constructive discharge claim, alleging that he had been wrongfully discharged from his position as warden of the Tucker Unit when he was demoted and that the defendants' actions were intended to force him to resign from the ADC. The district court did not instruct the jury on the constructive or wrongful discharge claim or submit a claim for punitive damages.

The case went to trial, and at the close of Campbell's evidence the remaining defendants moved for judgment as a matter of law as to all claims and reasserted their qualified immunity defense. The district court dismissed the claims against Manning on the ground that Campbell had not shown that any of her actions rose to the level of a constitutional violation. The court indicated it would continue to consider the legal objections to the due process claim, but that it would submit the claim to the jury in the meantime.[6] The motion for judgment was denied as to Campbell's free speech claim and the qualified immunity defenses. The defense motions were renewed at the close of all the evidence, and the court ruled similarly again.

The jury returned a verdict in Campbell's favor on the free speech and due process claims and awarded him $94,000 for back pay and compensation for mental and emotional distress, humiliation, and loss of reputation. A hearing was held on the petition for injunctive relief, and the court ordered the defendants to reinstate Campbell to his former position as warden at Tucker with the same salary level, to remove him from probationary status, to remove derogatory letters from warden Toney that were in his personnel file, and to conduct an evaluation of Campbell's work for 1995. Judgment was entered, and eleven days later it was amended to add an award of $74,000 in front pay as an alternative to reinstatement. Norris and Guntharp, the only remaining defendants, filed a post trial motion for judgment as a matter of law or for a new trial. The district court denied the motion, reasoning that they were not entitled to qualified immunity and that there was "ample evidence that the defendants were unhappy with the 'bad press' resulting from [Campbell's] public exposure of the lax conditions he found upon his arrival as warden" at Tucker and that the purported reason for the demotion, poor job performance, was pretextual.

---

[6]In its comments the court suggested that Campbell had a property interest in the warden position and may have been denied due process by not receiving proper notice of the asserted basis for the decision to demote him.

-10-

Norris and Guntharp appeal from the amended judgment of the district court and from the denial of their post trial motion. They again seek entry of judgment in their favor or a new trial. They argue that Campbell's speech did not address matters of public concern because it was directed to internal panels of ADC employees and that there was no evidence that Norris and Guntharp knew about his intended statements to the CIRC. They also argue that his free speech claim is precluded by Norris' statement after the grievance hearing that no evidence of retaliation had been shown. They argue that he cannot succeed with his due process claim because he was an at will employee and had no property interest in the warden position and no liberty interest affected by his transfer. Even if he had any protected interest, he was provided all the process to which he was due and any such interest was not clearly established at the time of his transfer. They also claim they are entitled to eleventh amendment and qualified immunity and that front pay is not available because it would only serve to redress a past injury. If they are not entitled to judgment as a matter of law, they should receive a new trial because the district court abused its discretion in refusing to give their business judgment instruction to the jury and committed plain error by referring to some defense evidence as "farfetched."

Campbell did not appeal the decisions adverse to him dismissing some of his claims and two of the defendants, and he argues that the appeal of Norris and Guntharp is without merit. He says that his speech about inadequate security conditions and corruption at Tucker clearly addressed matters of public concern and there was sufficient evidence that he was demoted in retaliation for it. He contends that the unlawfulness of a retaliatory demotion under such circumstances was clearly established so there can be no qualified immunity on this claim. Campbell also argues that he had a property interest in the warden position created by AR 225 and that his efforts to clean up the Tucker Unit affected the public good and thus fit the public policy exception to the Arkansas at will doctrine. He says that the decision not to use the business judgment instruction was within the court's discretion, that it was unsupported by the evidence, and that the instructions adequately reflected the

applicable law. Finally, Campbell contends that the denial of eleventh amendment immunity to appellants was proper, that the front pay award was an appropriate alternative remedy, and that the court's comment on the evidence was in response to a relevance objection and not plain error.

## III.

Denial of a motion for judgment as a matter of law is reviewed de novo. See Curtis v. Electronics & Space Corp., 113 F.3d 1498, 1502 (8th Cir. 1997). It is assumed that the jury resolved all conflicts in the evidence in favor of its verdict and that all facts were proved which the nonmoving party's evidence tended to show. See Ryther, 108 F.3d at 844. Judgment as a matter of law is appropriate only when there is a complete absence of probative facts to support the verdict such that no reasonable juror could have found for the prevailing party. See Curtis, 113 F.3d at 1502.

## A.

To establish a retaliatory demotion in violation of the first amendment a public employee must show that his speech was protected and that it was a substantial or motivating factor in the adverse employment action taken against him. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). A public employee's expression is protected when it addresses a matter of public concern, and this is "determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). From the time he arrived at the Tucker Unit, Campbell reported breaches in security and unsafe conditions to Guntharp and Norris. He sought adjustments to cell doors, hazardous pay for his workers, and other measures to improve security. He had difficulty getting cooperation from his superiors.

The proper functioning of a maximum security prison with death sentenced prisoners is a matter of significant concern to the larger community, as are the existence of corruption and dangerous working conditions in a prison and inmate access to tools, weapons, and flammable substances that could facilitate violence and escape. See Connick, 461 U.S. at 146 (protected expression is that which can be "fairly considered as relating to any matter of political, social, or other concern to the community"). There was sufficient evidence for the jury to find that Norris and Guntharp demoted Campbell because they blamed him for publicizing these kinds of problems at Tucker. There was evidence of their unhappiness about media attention to the prison conditions and the resulting pressure on them from the governor's office and legislature. In their interaction with Campbell and other staff, they emphasized keeping the media away in order to avoid negative publicity about the prison and its administration. Guntharp and Norris reprimanded Campbell for the way he called attention to policy violations and security breaches, particularly the flow of dangerous contraband into the prison. Much of the evidence appellants now rely on concerning Campbell's alleged performance problems may have been manufactured after the fact. Campbell had previously received high performance ratings from Guntharp while serving as warden of a different prison, and no criticisms of his managerial skills appeared in his personnel file. Defendants relied heavily on criticisms first stated in writing in a memorandum Guntharp wrote after Campbell had filed the grievance challenging his demotion. All of this evidence tended "to undermine the . . . proffered reason for" demoting Campbell, "and thus to establish that it was a pretext." Stemmons v. Missouri Dept. of Corrections, 82 F.3d 817, 821 (8th Cir. 1996).

Appellants argue that activities Campbell characterized as protected conduct, particularly his testimony at the Pitts grievance hearing, involved the internal affairs of the ADC and that he was acting as an employee on "matters only of personal interest." Connick, 461 U.S. at 147 ("absent the most unusual circumstances," federal court will not review personnel decision when public employee speaks as "an employee upon matters only of personal interest"). Campbell's communications addressed the safety

-13-

of prison employees and the surrounding community, however, as well as the overall effectiveness of the prison unit. These are all matters well beyond the procedural technicalities of prison administration or personnel matters of particular concern to him as an individual. Cf. id. at 148-49 (individual employee complaints over internal office affairs and her transfer not matters of public concern). Campbell brought to the attention of Guntharp a problem with cell doors in the unit that went uncorrected and ultimately led to the escape of an inmate who fatally stabbed a prison guard. He was also responsible for the discovery and disclosure of an unprecedented amount of dangerous contraband.

Campbell's efforts to bring these conditions to light, particularly after his supervisors failed to respond to the problems and treated him as overreacting to the situation, were relevant to whether the ADC and its administrators were "discharging [their] governmental responsibilities" and whether department employees were engaged in "actual or potential wrongdoing or breach of public trust." Connick, 461 U.S. at 148 (showing circumstances when internal events within a public office are a matter of public concern).[7] Campbell's testimony that Norris and Guntharp sought to influence what he would say at the Pitts grievance hearing could have been considered by the jury as additional evidence that the defendants wished to limit his speech concerning these topics. That hearing involved Campbell's termination of an employee whose mismanagement was believed to be partly responsible for the conditions at Tucker.

---

[7]Appellants do not attempt to argue that their interest in promoting the efficiency of the prison system outweighs any interest of Campbell in commenting on prison security and corruption. See Pickering v. Board of Educ. Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968). They argue instead that his speech did not fit within the definition of public concern. The Pickering balancing test would not work to their advantage since Campbell's criticisms actually addressed the ADC interest in running the prison in an effective and safe manner, and there was no evidence that the media attention created unrest or any other security risks at Tucker.

Norris and Guntharp also contend that Campbell's first amendment claim should fail because he made no effort to communicate his speech to the public, and they point out that he says he never initiated any contact with the press. Contacting the media is not necessary for a public employee's comments to be on matters of public concern, however. See id. at 146. Complaints to superiors or private communications with an employer about matters of public concern are also protected under the first amendment. See Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979); see also Powell v. Basham, 921 F.2d 165, 167 (8th Cir. 1990) (deputy sheriff's comments to superiors about concerns that touched on department operations and efficiency involved matters of public concern). Moreover, Campbell was interviewed by the news media concerning the conditions at the Tucker Unit, and Norris and Guntharp criticized him on more than one occasion for permitting the intense media coverage of the unit to continue. The jury could have relied on these facts to find that his speech was directed both to his employer and to the public.

Norris and Guntharp also assert that there was no evidence that they knew that Campbell intended to criticize their response to dangerous conditions in the maximum security unit when he was involved in the CIRC. The CIRC had been created to look into the Grimes murder, and there was evidence that Norris and Guntharp were aware at the time that Campbell had spoken out about the cell door defect that made Grimes' murder possible and that they believed Campbell called too much attention to such security problems. The jury could have inferred from this evidence that they suspected Campbell would bring these matters up before the committee or knew that he had announced at the first meeting that he intended to discuss these topics. His transfer on the very day that the CIRC was next scheduled to meet would support such an inference. In any event Campbell did not need to show that they knew what he intended to report to the CIRC in order to succeed on his first amendment claim. There was sufficient evidence that they believed that his general outspokenness on security and corruption encouraged media criticism of ADC management. When Guntharp notified Campbell of his demotion, he specifically criticized him for not being able to

keep the media out of his unit. Viewing the evidence in the light most favorable to the verdict, a reasonable fact finder could infer that the decision to demote Campbell was motivated by his speech on security problems. See Engle v. Townsley, 49 F.3d 1321, 1324 (8th Cir. 1995).

Norris and Guntharp argue that they are entitled to qualified immunity on the first amendment claim. Government officials are immune from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Appellants do not contest that the law prohibiting adverse employment actions in retaliation for a public employee's free speech was clearly established at the time. See Connick, 461 U.S. at 142; Pickering, 391 U.S. at 574. They do argue that it was not clearly established that Campbell's particular type of communication was protected as dealing with matters of public concern. This argument turns on whether a reasonable person would have known that Campbell's demotion and transfer violated a clearly established right if it was in retaliation for his speech about prison conditions. See Engle, 49 F.3d at 1323 (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)). The verdict shows that the jury found Campbell spoke out on such matters as security breaches, contraband, malfunctioning cell doors, and corruption and that this speech caused the defendants to transfer and demote him. It was clearly established at the time that prison security and prison operations are matters of public concern, and Campbell's right to bring these problems to light, both within the department and in a manner that attracted media attention, was also clearly established. See Powell, 921 F.2d at 167 (criticism to sheriff of department operations was clearly established free speech right). A reasonable person would have known that retaliating against Campbell for exercising his free speech rights on such matters of public concern would clearly violate his constitutional rights. Norris and Guntharp are not entitled to qualified immunity.

-16-

Norris and Guntharp also argue that Campbell is precluded by collateral estoppel from proving retaliation in this case because Norris said he found no evidence of retaliation after the ADC grievance hearing.[8] The findings of fact from a state administrative proceeding are entitled to preclusive effect "provided that the [state] agency was acting in a judicial capacity, the questions litigated were properly before the agency judge, and the parties had an adequate opportunity to litigate them." Alexander v. Pathfinder, Inc., 91 F.3d 59, 62 (8th Cir. 1996) (citing University of Tennessee v. Elliott, 478 U.S. 788, 797-99 (1986). Issue preclusion does not apply with equal force to all administrative proceedings, however. See Hamilton v. Arkansas Pollution Control & Ecology Comm'n, 969 S.W.2d 653, 656 (Ark. 1998) (citing Arkansas Memorial Gardens, Inc. v. Simpson, 381 S.W.2d 462, 464 (Ark. 1964)).

Campbell's grievance hearing was not sufficiently like a judicial proceeding for Norris' statement about the evidence to be given preclusive effect in this case. The hearing was held before Norris and took place in his office. Norris was Director of the Department of Corrections and the individual to whom Campbell's supervisor reported, and he had been personally involved with some of the underlying events. He had firsthand knowledge of much of the background prior to the hearing, yet was unavailable for Campbell to produce as a witness. He had given advance approval to the decision to demote Campbell, and the key issue was the appropriateness of this decision. He was not in a similar position to a typical administrative law judge, and the department hearing also did not provide an adequate opportunity to develop the evidence. Campbell was unable to subpoena witnesses, and he and Guntharp were not sworn. The hearing lasted only two hours. In his letter finding the demotion decision to have been correct, Norris stated that Guntharp had demoted Campbell because of

[8]In his letter giving his decision rejecting Campbell's appeal of his transfer, Norris stated that he found "no evidence that your demotion was pretextual or done in retaliation." In his previous sentence he had described Campbell's grievance as being that his demotion was "pretextual and in retaliation for the uncovering of contraband evidence and other security lapses."

a deteriorating situation at Tucker rather than in retaliation for uncovering security lapses, but he did not mention the argument Campbell made at the hearing that Guntharp had demoted him for generating media attention even though Guntharp spoke at the hearing about his unhappiness with the contraband display. His brief decision letter did not refer to this part of the grievance and did not make detailed findings of fact and conclusions of law. The situation here is completely unlike the cases cited by appellants on the issue of preclusion. See Elliott, 478 U.S. at 791 n.2; Alexander, 91 F.3d at 62.

There was sufficient evidence to support liability against both Norris and Guntharp on Campbell's first amendment claim, and for the reasons discussed they are not entitled to judgment as a matter of law on it. They do not challenge the amount of compensatory damages awarded by the jury or claim they are not recoverable under the first amendment. The case was submitted on verdict forms which first asked the jury to indicate its ultimate findings on the first amendment claim and on the due process claim. The jury was then instructed that it should find the amount of plaintiff's damages in accordance with Instruction 9 if it found in favor of the plaintiff on either claim. Instruction 9 provided that damages could include any back pay, mental and emotional distress, humiliation, and loss of reputation suffered by Campbell as a result of his demotion and transfer. Since the verdict in favor of Campbell and the damages awarded are supported by the evidence and the law as to his first amendment claim, it is not necessary to discuss his due process claim.[9] See Hinkle v. Christensen, 733 F.2d 74, 76 (8th Cir. 1984).

**B.**

---

[9]We note that Campbell has not pointed to any express provision that an ADC warden can only be demoted or dismissed for cause so it is questionable that he can make out a property interest in the position. See Black v. Barnett, 999 F.2d 1295, 1296 (8th Cir. 1993); Drake v. Scott, 823 F.2d 239, 241-42 (8th Cir. 1987).

In support of their alternate request for a new trial appellants contend that the district court abused its discretion by refusing to include their business judgment instruction in its explanation of the law on the retaliation claim. The court instructed the jury that its verdict would have to be for the defendants if it found that they would have demoted Campbell regardless of his free speech activities, but it declined to add the requested instruction that the jury could not decide for Campbell just because it "might disagree with [defendants'] decision or believe it to be harsh or unreasonable." A business judgment instruction has been recognized as sometimes appropriate for a first amendment retaliation claim. See Eighth Circuit Manual of Model Jury Instructions (Civil) § 5.71 notes on use (1998). A district court has broad discretion in instructing the jury, however. See Gray v. Bicknell, 86 F.3d 1472, 1485 (8th Cir. 1996). The instructions must be considered as a whole in considering any challenge. See Slathar v. Sather Trucking Corp., 78 F.3d 415, 418 (8th Cir. 1996); Resolution Trust Corp. v. Eason, 17 F.3d 1126, 1132 (8th Cir. 1994).

Given the evidence and the instructions viewed as a whole, we find the district court did not abuse its discretion in declining to give the particular instruction requested by the defendants. The substance of defendants' business judgment theory was covered by the court's instructions and argued by counsel in opening and closing, and defendants had the opportunity to present evidence supporting their asserted reasons for the demotion. See Stemmons, 82 F.3d at 821 (no abuse of discretion when defendant able to argue and present evidence on its business judgment theory). The defendants have not shown they were prejudiced by the refusal to give their business judgment instruction and any error was harmless in light of the ample evidence that Campbell was demoted for exercising his free speech rights. See id.

Appellants also argue that the district court committed plain error by its comment during the testimony of a defense witness.[10] The witness was called at the start of the last day of trial and testified that he had heard Campbell make an inappropriate comment in 1990 about the Arkansas Parole Board and that he once had trouble getting him to send a file for a parolee transfer. The witness began a lengthy description of the context in which he needed the file, and Campbell's counsel raised a relevance objection. The court initially sustained it, but opposing counsel argued that the explanation was relevant because the witness ultimately had to contact Guntharp to get the file. The court then allowed the testimony to go forward, saying: "Well, go ahead and let's see where it leads, but this seems awful farfetched. In fact, all this testimony seems to me to be pretty farfetched, but go ahead."

Appellants argue that this comment undermined their entire defense concerning Campbell's history of performance problems. The court made the comment in the course of reconsidering an evidentiary ruling, and it does not appear to have been "intended or calculated to disparage [a party] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." La Barge Water Well Supply Co. v. United States, 325 F.2d 798, 802 (8th Cir. 1963). Under plain error review it would be "grounds for reversal only if [it] prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." Rush v. Smith, 56 F.3d 918, 922 (8th Cir. 1995) (en banc). The comment addressed the relevance of the testimony and warned counsel that it was on the borderline of admissibility. It was quite clearly directed at the particular witness who was testifying, rather than to the defense case in general, and the entire testimony of the witness, including the argument of counsel, covered only six pages of transcript. Appellants have not shown they are entitled to a new trial on this basis.

---

[10]Appellants concede that the comment can only be reviewed for plain error because they failed to object to it at the time.

## C.

Norris and Guntharp challenge certain aspects of the equitable relief on eleventh amendment grounds. They assert a right in their official capacities to the same absolute immunity from injunctive relief under § 1983 to which the ADC was entitled as a sovereign state agency. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989). The district court correctly ruled, however, that they may be sued in their official capacities for prospective, injunctive relief. See Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 697 (3d Cir. 1996) (citing Ex parte Young, 209 U.S. 123, 166-68 (1908)); Freeman V. Michigan Dept. of State, 808 F.2d 1174, 1179 (6th Cir. 1987) (same). They also contend that the alternative award of front pay against them in their official capacities would violate the eleventh amendment. When reinstatement is not possible, front pay is generally an appropriate alternative equitable remedy. See Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 322 (8th Cir. 1993). For purposes of the eleventh amendment, however, front pay is not analogous to the prospective relief permitted under Ex parte Young because it "must be paid from public funds in the state treasury." Edelman v. Jordan, 415 U.S. 651, 663 (1974). The alternative front pay award is therefore barred by the eleventh amendment. See Blanciak, 77 F.3d at 697; Freeman, 808 F.2d at 1179; see also Grantham v. Trickey, 21 F.3d 289, 296 n.5 (8th Cir. 1994).

For other reasons it is unclear whether the remaining injunctive relief ordered by the district court is still appropriate. The judgment contains orders to reinstate Campbell as warden at Tucker with the same salary level, to remove him from his one year probation, to remove certain letters from his personnel file, and to perform an evaluation of his work for 1995. Subsequent to oral argument appellants' counsel informed this court that Campbell has given formal written notice that he would resign from the ADC on August 3, 1998 and that his physician would release him from care on that date. A copy of Campbell's short letter of resignation has also been submitted; it does not give his reasons. At this time we can only speculate whether his

circumstances have changed in such a way that future employment with the ADC or as warden of Tucker may no longer be a viable remedy. It is also unclear whether portions of the order relating to his probation and evaluation may now be moot. The case must therefore be remanded for further consideration of these issues relating to the injunctive relief originally ordered by the court.

## IV.

After reviewing the record we affirm all aspects of the judgment except for the award of equitable relief. As to that portion of the judgment, we reverse the award of front pay and remand the other portions of the order for injunctive relief for further proceedings consistent with this opinion.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.