## In re ACCEPTANCE INSURANCE COMPANIES, INC., SECURITIES LITIGATION.

### No. 8:99–CV–547.

United States District Court, D. Nebraska.

March 31, 2004.

Frederick S. Cassman, Abrahams, Kaslow Law Firm, John K. Green, Pickens, Green Law Firm, Omaha, NE, Gregory M. Castaldo, Schiffrin, Barroway Law Firm, Bala Cynwyd, PA, Jonathan M. Stein, Paul J. Geller, Cauley, Geller Law Firm, Boca Raton, FL, Joseph V. McBride, Rabin, Peckel Law Firm, Justin C. Frankel, Michael A. Swick, Robert A. Wallner, Steven G. Schulman, Milberg, Weiss Law Firm, Marvin L. Frank, Rabin, Murray Law Firm, New York, NY, for Plaintiffs.

David H. Kistenbroker, Joni S. Jacobsen, Laura M. Vasey, Leah J. Domitrovic, Matthew J. Cannon, Michael S. Weisman, Pamela G. Smith, Theresa L. Davis, Katten, Muchin Law Firm, Alan N. Salpeter, Brian J. Massengill, Daniel J. Delaney, Mayer, Brown Law Firm, Chicago, IL, J. Michael Gottschalk, Joseph K. Meusey, Mark C. Laughlin, Fraser, Stryker Law Firm, Omaha, NE, for Defendants.

Edward G. Warin, McGrath, North Law Firm, Omaha, NE, pro se.

Gregory A. Horowitz, Kramer, Levin Law Firm, New York, NY, pro se.

Marc A. Topaz, Schiffrin, Barroway Law Firm, Bala Cynwyd, PA, pro se.

Gregory M. Castaldo, Schiffrin, Barroway Law Firm, Bala Cynwyd, PA, pro se.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CAMP, District Judge.

The background of this case has been summarized on previous occasions. In admittedly simplistic terms, Acceptance Insurance Company and other related entities, and three of its corporate officers, have been sued in this securities fraud action by individuals and entities that invested money in the corporations. The claims initially were presented in three separate actions that have been consolidated and certified as a class action in this one master file. On June 16, 2000, Plaintiffs filed a Consolidated Class Action Complaint asserting claims under the Securities Act and the Exchange Act (Filing No. 40), specifically, Sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78j and 78t(a) (the "Exchange Act") and Rule 10(b)–5, 17 C.F.R. § 240.10b–5. Following motions under Fed.R.Civ.P. 12, the remaining defendants are Acceptance Insurance Companies, Inc. ("Acceptance"), Kenneth Coon, Georgia Mace, and John Nelson.

At issue is whether the corporations, through their officers, were possessed of material information that was required by law to be disclosed to the investing public and was not disclosed. The gravamen of Plaintiffs' Amended Consolidated Class Action Complaint is that the Defendants failed to disclose material information regarding the increasing number of California contractors' claims covered by Acceptance and the attendant risk that Acceptance faced in being under-reserved for losses in the wake of the 1995 California Supreme Court decision, *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995).[1]

Acceptance was a holding company that, through subsidiaries, underwrote specialty property and casualty insurance coverage throughout the United States. Kenneth Coon was Acceptance's Chief Executive Officer and Chairman of the Board of Directors. Georgia Mace was the Chief Financial Officer and Treasurer. John Nelson was the President and Chief Operating Officer. Following consolidation, the lead plaintiffs are Lawrence I. Batt, P.C. Profit Sharing Plan; Barbara Winer Revocable Trust; Diana L. Kinder; and Jerome S. Richman, Co–Trustee of the Joe Sonken Trust, all of whom invested in the Acceptance during the relevant class action period.

### Issues Before the Court

Before the Court is the Defendants' Motion for Summary Judgment (Filing No. 241). That motion has ignited additional motion practice between the parties, most significant being the parties' cross-motions to strike evidence that has been offered in connection with the motion for summary judgment (Filing Nos. 254 and 258). The Defendants ask the Court to strike Plaintiffs' Exhibits 22 and 23, which are the Plaintiffs' expert witness affidavits, and to strike Exhibits 1, 5, 6, 8, 9, 10, 11, 17, 20, and 21. Defendants also seek to sanction the Plaintiffs pursuant to Fed.R.Civ.P. 56(g), for offering in opposition to the Defendants' Motion for Summary Judgment some of the evidence that Defendants seek to strike. (Filing No. 254). The arguments offered in support of the Defendants' Motion to Strike are set forth in the Defendants' Reply Brief Offered in Support of the Motion for Summary Judgment and in the Defendants' Brief in Support of the Motion to Strike, Filing Nos. 252, 254.

Plaintiffs oppose the Defendants' motion for summary judgment, in part by seeking to strike Defendants' Exhibits 3 and 7. In addition, Plaintiffs seek sanctions against the Defendants for seeking sanctions against them (Filing No. 258). Plaintiffs' arguments are set forth in their briefs in opposition to the Defendants' motion for summary judgment and in support of their motion to strike (Filing Nos. 249 and 259).

Lest there be insufficient motion practice in this case, Plaintiffs have also filed a Motion to Strike (Filing No. 261) aimed at the Defendants' brief that was offered in opposition to the Plaintiffs' Motion to Strike because, Plaintiffs contend, the Defendants' brief is essentially a reply brief that was filed without leave of the Court. The Defendants have filed a brief in opposition to that motion (Filing No. 262). To the extent that the Defendants' brief at Filing No. 260 offers argument in opposition to the Plaintiffs' Motion to Strike, it has been considered, but no other argu-

---

1. The *Montrose* Court adopted for the first time in California a "continuous injury trigger" theory of liability which had the effect, "in the case of successive policies ... [that] damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." *Id.*, 913 P.2d at 880.

ment contained in the brief will be considered.

In another preliminary matter, though I find that the motion practice is certainly zealous and arguably overdone, I do not find that there is anything in the parties' submissions to the Court relative to the motions for summary judgment and the attendant motion practice that was submitted frivolously or in bad faith. The cross-motions for sanctions (which are contained within Filing Nos. 254 and 258) are denied.

## Summary Judgment Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir.2003). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). "Importantly, 'a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir.1997) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2725, at 104–05 (2d ed.1983)). The proponent need not, however, negate the opponent's claims or defenses. *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348.

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548. Nevertheless, the Court's function is not to weigh the credibility and persuasiveness of evidence in the context of a motion for summary judgment. *Kampouris v. St. Louis Symphony Soc'y*, 210 F.3d 845, 847 (8th Cir.2000).

## Cross–Motions to Strike Evidence

The Court must consider the cross-motions to strike evidence before taking up the merits of the summary judgment motion. The Court must decide which exhibits are properly part of the record on summary judgment and which exhibits do not satisfy the requirements of Fed. R.Civ.P. 56(e). I must determine whether the Defendants are entitled to summary judgment, based on evidence that satisfies the requirements of Rule 56, because the Plaintiffs' evidence proves "nothing more than differences in judgments and criticism by hindsight," or whether the Plaintiffs are entitled to proceed to trial because there are genuine issues of material fact that remain to be resolved. *See Mathews v. Centex Telemgmt., Inc.*, 1994 WL 269734, *2 (N.D.Cal.1994). Because the Defendants bear the initial burden of coming forward with evidence demonstrat-

ing the basis of their motion and the absence of a genuine issue of material fact, I will take up the Plaintiff's Motion to Strike the Defendants' evidence, and in turn, the Defendants' Motion to Strike.

### Plaintiffs' Motion to Strike

■ Plaintiffs seek to strike all or parts of Defendants' exhibits 3, 5, and 7, as "rank hearsay" that is not admissible under any exception to the hearsay rule. Exhibit 3 contains PricewaterhouseCoopers' (hereafter "PwC") 1996–1999 Actuarial Opinions; Exhibit 5 contains Deloitte & Touche's (hereafter "D & T") independent auditors' reports that are included in Acceptances 1996–1999 Forms 10–K; and Exhibit 7 is PwC's Actuarial Reports which include some of the actuarial opinions from Exhibit 3 for the period 1996–1999. (Filing No. 242). Plaintiffs contend that the Defendants are attempting to avoid the requirements of Fed.R.Evid. 702 by presenting the exhibits as business records subject to the hearsay exception at Rule 803(6).

It is fair to observe that PwC and D & T were retained by Acceptance for several years preceding this litigation, and it is fair to restate the Defendants' observation—that a witness's expertise in a given field of study does not transform that witness into an expert witness under Rule 702. The information contained in these reports is part of the factual record of this case. The Defendants argue that the reason for the submission was to demonstrate the absence of scienter in support of their motion for summary judgment. Neither PwC nor D & T were retained to serve as expert witnesses or to prepare expert opinions on behalf of the Defendants in connection with this litigation. Rule 702 does not apply to these opinions.

A business record is admissible under Rule 803(6) if "made at or near the time [of the events] by ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record," unless other circumstances suggest a "lack of trustworthiness." Fed.R.Evid. 803(6). Federal Rule of Evidence 803(6) requires that before a document may be admitted into evidence under the business-records exception to the hearsay rule, it must be authenticated by the "testimony of the custodian [of the record] or other qualified witness." *United States v. Riley*, 236 F.3d 982, 984–985 (8th Cir.2001).

■ I find that the Defendants have provided the necessary testimony to establish the authenticity of the documents and the foundation required under the business exception rule. Filing 242, Ex. C, O'Brien Aff. at ¶ 2. Defendants' Exhibits 3, 5, and 7, will be received for the purpose of showing the involvement of professional actuaries and auditors in the reserve-setting process and in the satisfaction of public filing requirements. The Plaintiffs' Motion to Strike is denied in its entirety. I now turn to the Defendants' Motion to Strike.

### Defendants' Motion to Strike

**Plaintiffs' Expert Witness Affidavits**

Turning to the Plaintiffs' evidence offered in opposition to the motion for summary judgment, the Defendants ask the Court to strike the affidavits of Plaintiffs' expert witnesses, Harris L. Devor, Exhibit 22; and Richard L. Fallquist, Exhibit 23, both found at Filing No. 249. Defendants urge the Court to reject the evidence arguing that the witnesses were not timely disclosed pursuant to Fed.R.Civ.P. 26(a)(1) and that the affidavits do not provide sufficient foundation for the opinions contained in them as required by Rule 56(e) and by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ The Defendants' objection to Exhibits 22 and 23 based on an alleged violation of Rule 26 ignores the Court's progression of this case. While it is true that the Defendants have served discovery seeking the identity of Plaintiffs' expert witnesses and the substance of their opinions, in the Court's Interim Progression Order dated April 1, 2003 (Filing No. 228), Magistrate Judge Kathleen A. Jaudzemis stated:

> After consultation with the parties, it was agreed that two substantive matters should be scheduled and resolved by the court before the court progressed the deadlines for the identification and depositions of expert witnesses, closed discovery, ordered the identification of trial exhibits, and scheduled the final pretrial conference and trial date.

The Court's Interim Progression Order supersedes the more general requirements of Rule 26. Indeed, Rule 26(a)(2), which governs the disclosure of expert witnesses, contemplates that a court order will trump the deadline for expert witness disclosure that is contained in the rule. Thus, I conclude that Rule 26 and Defendants' prior discovery requests do not bar the Plaintiffs' use of expert witness affidavits to oppose the motion for summary judgment. However, that does not end the inquiry because the affidavits still must satisfy the requirements of Fed.R.Civ.P. 56(e), Fed. R.Evid. 702, and the requirements set forth in *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *In Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ Under *Daubert* and *Kumho*, this Court is required to screen proffered expert testimony for relevance and reliability. *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1040 (8th Cir.1999). A reliable opinion must be based on scientific methodology rather than on subjective belief or unsupported speculation. *See Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000). Furthermore, the expert's information or opinion must "assist" the trier of fact to understand or determine a fact in issue. Fed.R.Civ.P. 702.

In the first part of the *Daubert* analysis, the Court must consider "whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to scientific method; it must rule out 'subjective belief or unsupported speculation.' " *Porter v. Whitehall Lab.*, 9 F.3d 607, 614 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.) In *Kumho Tire*, the Supreme Court held that *Daubert* applies to all expert testimony, not only scientific expert testimony. *Id.*, 526 U.S. at 141, 119 S.Ct. 1167. In the second part of the *Daubert* analysis, the district court has to "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Id.* at 616, 113 S.Ct. 2786.

■ In assessing reliability, the Court should consider factors including whether the proposed expert's theory, methodology or technique: 1) can be and has been tested; 2) has been subjected to peer review; 3) has a known or potential rate of error; 4) is generally accepted by the relevant community; 5) ruled out alternative explanations; and 6) sufficiently connected the proposed testimony with the facts of the case. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 687 (8th Cir.2001); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th Cir.1999). This list of factors is not exclusive, and this Court is allowed "great flexibility" in its analysis. *Id.*

■ Richard J. Fallquist was retained by Plaintiffs' counsel "to provide net loss and loss expense reserve estimates for the general liability primary line of business of Acceptance Insurance Companies as of 12/31/96, 12/31/97, and 12/31/ 98." Exhibit 23. I find that Fallquist's affidavit fails the first part of the *Daubert* analysis because his opinion is not verifiably supported by any discernable methodology. Fallquist identified the documents that he reviewed in connection with his work on this case, stating that he "used *portions* of this data to perform the actuarial analysis of the loss and loss expense reserve estimates for the general liability primary line of business" of AIC. Exhibit 23, emphasis added. Thus, it is not clear which documents that he identified were actually used by him in formulating his opinions, and an explanation of his methodology is completely absent from the affidavit.

Rule 56(e) requires experts to set forth facts and explain the reasoning they used in reaching their conclusions—not just the conclusions. This has been described as "a process of reasoning beginning with a firm foundation. *Id.* at 1339." *Zarecki v. National R.R. Passenger Corp.*, 914 F.Supp. 1566, 1574 (N.D.Ill.1996) quoting *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989). The *Zarecki* Court also observed, "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* quoting *Mid–State Fertilizer*, 877 F.2d at 1339.

Richard Fallquist's affidavit provides the Court with little more than a bottom line opinion. After expert witness disclosures have been made and depositions taken, Fallquist's opinions may have been supported by an explanation of the facts or reasoning used in formulating those opinions. However, the failure to include that foundation within the affidavit renders it of no use to this Court in evaluating the propriety of summary judgment. Exhibit 23 shall be stricken from the summary judgment record.

■ Defendants also seek to strike the affidavit of Harris L. Devor (Exhibit 22). Mr. Devor, who has been retained as an expert witness by the Plaintiffs, is a certified public accountant and a shareholder in the accounting firm of Shechtman, Marks, Devor & Etskovitz, P.C., in Philadelphia, Pennsylvania. He was retained to give his expert opinion on whether AIC's financial statements that were filed or incorporated into public filings dated from July 29, 1997, through November 16, 1999, were prepared in accordance with Financial Accounting Standard No. 5. ("FAS No. 5"). In his affidavit, Devor sets forth some foundation for his expert opinions, including an explanation of accounting theory and his interpretation of various accounting rules, including FAS No. 5. However, like Fallquist, Devor does not explain how he reached his ultimate opinions nor does he describe the analytical processes he went through to reach his opinions. For these reasons, I conclude that Devor's affidavit does not satisfy the second part of the *Daubert* analysis, and I conclude that, at this stage of the proceedings when the Court is considering the existence of genuine issues of material fact, the Devor affidavit is not particularly helpful to the Court. Accordingly, Exhibit 22 shall also be stricken from the summary judgment record.

**Documents Containing Inadmissible Hearsay**

The Defendants contend that much of the evidence offered in opposition to their motion for summary judgment is hearsay, or double hearsay. Under Rule 56, this Court may consider only evidence that is competent and would be admissible at trial. Fed.R.Civ.P. 56(e). On motion for

summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). "[U]nsworn, out-of-court statements [that are offered] for the truth of the assertions in them [are] hearsay, Fed.R.Evid. 801(c), ..." and summary judgment cannot be based upon on such statements. *Erickson v. Farmland Industries, Inc.*, 271 F.3d 718, 728 (8th Cir.2001).

**Mertz Deposition**

The Defendants seek to strike Plaintiffs' Exhibit 1, the deposition of Michael Mertz, the former Director of Market Analysis for Acceptance and reported directly to Coon. Mertz at 14. Plaintiffs rely on statements made by Mertz to demonstrate that Acceptance was under-reserved. Defendants contend that the statements from Mertz's deposition upon which Plaintiffs rely are inadmissible hearsay. Plaintiffs contend that Mertz testified that Mace and other Acceptance employees had communicated to him their opinions that Acceptance was under-reserved. In response to a leading question, Mertz agreed that *Montrose* was a "big problem." Mertz at 90.[2] His agreement with the questioner is admissible.

■ Mertz also described his understanding of how the reserving process worked at Acceptance, which is admissible even though he was not one of the persons responsible for setting reserves. Mertz. at 27–31; 101 and 103. Mertz also made broad statements such as "people in the claims department knew that *Montrose* was resulting in claim activity" prior to

1997, and that "[i]t was well known throughout the company that *Montrose* was having—there were a lot of *Montrose* claims, shall we say." Mertz. at 92–93. Mertz identified two claims personnel by name whom he recalled making statements to that effect to him, but he was not specific about what was said. Mertz at 93. Mertz also identified Mace as making these kinds of remarks, and his testimony about what Mace said is: "I used to visit with Georgia from time to time about a variety of things, and I believe she mentioned that Montrose could have an adverse effect on the company in the course of those conversations." Mertz at 99. An observation that is speculative in nature, such as Mace's purported statement that "Montrose could have an adverse effect," is not excluded from the hearsay rule as an admission under Fed.R.Evid. 801(d)(2), nor is Mertz's statement attributed to Mace in connection with the reserving process, that Nelson's estimates were "optimistic."

■ Mertz's nonspecific testimony about what "people in the claims department" said or knew lacks sufficient foundation to satisfy the requirements of Rule 56(e). To the extent that he is trying to attribute these remarks to specific claims personnel, they are hearsay and not admissible. However, his testimony related to his opinion that the Board of Directors applied pressure to maximize earnings, is admissible. Mertz at 94–96. Accordingly, the Defendants' motion to strike Plaintiffs' Exhibit 1, Mertz's deposition, will be granted in part and denied in part consistent with this Memorandum.

---

**2.** Most of the depositions referenced in this Memorandum are contained in the Defendants' evidentiary submission, Filing No. 242, at Exhibit B "Domitrovic Affidavit" at Exhibit 1. The Mertz deposition can be found in Plaintiffs' evidentiary submission, Filing No. 249 at Exhibit 1, and at Defendants' supplemental evidentiary submission at Filing No. 253 at Exhibit 1. In this Memorandum, citation to deposition testimony will be to the deponent's last name and page number.

**OWH Article, 10–K Forms and *Magid* decision**

Defendants also seek to strike the following exhibits from the summary judgment record because they are hearsay: Exhibit 8, which is the decision of *Magid v. Acceptance Insurance Companies, Inc.,* 2001 WL 1497177 (Del.Ch. Nov.15, 2001), and Exhibits 9, 10 and 11, which are the Form 10–K Statements of three publicly-traded insurance companies that were affected by *Montrose* and that were under a legal obligation to file these statements, which they filed for the year ending December 31, 1996.

▇▇▇ To the extent that Plaintiffs rely on a May 28, 1999, article from the *Omaha World–Herald* that purports to quote Mertz or Coon, Defendants argue that quotations included in newspaper articles are hearsay, and double hearsay. I agree that the newspaper article is hearsay, and if the Plaintiffs had intended to make the article part of the record on this motion— and that fact is not clear to me—then the newspaper article is stricken because it is hearsay. *See Eisenstadt v. Centel Corp.,* 113 F.3d 738, 744–745 (7th Cir.1997) (holding that district judge's decision to admit a newspaper article would have been an abuse of discretion, and that the article, offered in opposition to a motion for summary judgment, was not admissible because there was doubt about its meaning and accuracy, and because the report's author had been available to give an affidavit or deposition).

▇▇▇ With regard to Exhibits 8, 9, 10, and 11, I find that each and all of these proposed exhibits constitute inadmissible hearsay. Accordingly, they will not be considered In connection with the summary judgment motion and will be stricken from the record for the following reasons.

The *Magid* opinion, Exhibit 8, which was not even decided until November 2001, and to which I previously ascribed minimal *legal* weight in the context of the Plaintiffs' Motion to Amend,[3] contains judicial findings that are hearsay that would not be admissible at trial. Accordingly, Exhibit 8 will be stricken from the record. See *Nipper v. Snipes,* 7 F.3d 415, 417–18 (4th Cir.1993)(holding that judicial findings of fact are not public records within the meaning of Rule 803(8)(C)); and *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388–89 (2nd Cir. 1992).

With regard to Exhibits 9, 10, and 11, which are Form 10–Ks filed by three other insurance companies for the year ending December 1996, the Defendants contend that these are hearsay to which no exception applies. For purposes of this motion, the Form 10–Ks will not be considered because Plaintiffs failed to authenticate and lay foundation for the documents under any exception to the hearsay rule. See *White Indus., Inc. v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1069 (W.D.Mo.1985)(holding that an SEC 10–K Form is not admissible under Rule 803(17)); and *Huddleston v. Herman & MacLean,* 640 F.2d 534, 553 (5th Cir.1981) *aff'd in part and rev'd in part on other grounds* pertaining to burden of proof 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (holding that "portions of [SEC 10–K Form] may be admissible as a record of regularly-conducted activities, *i.e.,* business records, Rule 803(6), Fed.R.Evid., if a proper foundation is laid").

**Wilkins Notes**

▇▇▇ The Defendants object to the Plaintiffs' use of Defendants' Exhibit 17, which is a copy of handwritten notes dated

---

**3.** The Plaintiffs construed the Court's reference in the February 2003 opinion to mean

that I was assigning some factual weight to *Magid,* which I do not.

May 28, 1997, prepared by Edward Wilkins who was then employed as an auditor with D & T. Plaintiffs rely upon Defendants' Exhibit 17 as some evidence of scienter to oppose the Defendants' motion for summary judgment. Acceptance retained D & T to provide independent auditing services. Defendants argue very generally that the notes constitute inadmissible hearsay that should be stricken from the record. The Plaintiffs argue that, in his deposition, Wilkins laid the foundation and authenticated the notes such that they would be admissible under the business records exception to the hearsay rule, Rule 803(6). Wilkins Dep. at 32–39. I agree.

Wilkins stated that he prepared the notes during the meeting with the Acceptance officers and representatives; that he prepared them in the regular course of his business with D & T; and that he retained them as part of D & T's "working papers" for his auditing work for Acceptance. Wilkins at 32–37. I conclude that his testimony adequately authenticates and lays the foundation for admission of the notes under the business records exception in Rule 803(6). See *Resolution Trust Corp. v. Eason*, 17 F.3d 1126, 1131–32 (8th Cir.1994)(holding that work papers of Federal Home Loan Bank Board which contained "excellent investment" notation were admissible under the business records exception to the hearsay rule, in part because the examiner's notes were prepared the course of their examination of the savings and loan's records); and *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061 (8th Cir.1995)(holding that with the proper foundation, an accountant's working notes were admissible under business records exception).

■■■■ This determination does not resolve the Defendants objection to the Plaintiffs' use of Defendants' Exhibit 17. Plaintiffs seek to rely on Wilkins's note of what Mace said during the May 1997 meeting as some evidence of scienter. When evidence contains multiple levels of out-of-court statements, courts must examine each level to determine whether the statements are in fact hearsay and, if so, whether each level meets the requirements of some exception to the hearsay rule. Fed.R.Evid. 805. *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061–62 (8th Cir. 1995). Plaintiffs contend that the Mace statement contained within the Wilkins's notes is admissible either as an admission under Rule 801(d)(2), or as an exception to the hearsay rule as a recorded recollection under Rule 803(5) or under the residual exception of 803(24).

Defendants argue that Wilkins stated that his notes were not a verbatim transcription and that they reflected only his summary interpretation of the statements made at the meeting that he considered to be important. Wilkins at 32–37. The Defendants argue that because of Wilkins's admittedly subjective view of the meeting which is reflected in his notes, Wilkins's note is an interpretation of what Mace actually said, and therefore, it does not qualify as admission under Rule 801(d)(2). Defendants also argue that the Mace statement is not admissible as a recorded recollection because there has been no showing that the words attributed to Mace were accurately recorded, see *United States v. Benson*, 961 F.2d 707, 709 (8th Cir.1992); and that the statement is not admissible under the residual exception because it is not the best evidence of the statements made at the meeting, which would be Mace's testimony or Wilkins's testimony.

I conclude that a portion of Wilkins's notes recording what Mace purportedly said at the May 1997 meeting is not admissible because it is hearsay. Having reviewed Wilkins's deposition, I find that the

statement attributed to Mace is not an admission. The statement attributed to Mace is: "Past problem was probably pressure for earnings. sounded like we committed a sin in the past. Won't do it again." Exhibit 17. Wilkins states that based on his notes, he believes that the statement he recorded was a reference to the "cancellation of the agents that were producing bad business," and the "sin" to which Mace referred was growing "unprofitable business" for Acceptance. *Id.* at 48, 51. Wilkins also testified that reference to "huge hits" referenced a significant increase to reserves that had to be made *in 1995,* in the approximate amount of 20 million dollars, which had nothing to do with *Montrose* claims or any claim made in this action. The statement is not admissible under Rule 801(d)(2).

■ The hearsay exception of past-recorded recollection under Fed.R.Evid. 803(5) applies only when the record is made or adopted by the witness. Where the documents were not reported verbatim and were unsigned and unsworn by declarant, they constituted inadmissible hearsay. See *Walker v. Wayne County, Iowa,* 850 F.2d 433 (8th Cir.1988). *United States v. Benson,* 961 F.2d 707, 709 (8th Cir.1992). This was not a verbatim reporting, and is not admissible as a past recorded recollection.

As to the accuracy of the notes, Wilkins stated in his deposition:

Q: And is it your practice when you write notes to accurately write those notes?

A: A shorthand version just to capture the main points.

Q: And how do you decide what points to write down . . . ?

A. Judgment.

Q: What is that judgment based upon?

A: Anything that was significant that I'd want to recall later.

*Id.* at 33–34. Given that testimony, I find that Wilkins' testimony demonstrates that the notes are not the kind of evidence admissible as a recorded recollection under Rule 803(5).

Further, I do not believe that the statements attributed to others that are recorded in Wilkins's notes satisfy the trustworthiness requirement or the so-called "best evidence" component of the residual exception contained in Rule 803(24).[4] The residual exception permits a court to admit hearsay if the statement is "[a] statement not specifically covered by Rule 803 and 804 but having equivalent circumstantial guarantees of trustworthiness, . . . if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence." See Fed.R.Evid. 807, preceded by Rule 803(24); and *In re Cirrus Logic Securities Litigation,* 946 F.Supp. 1446, 1468–1470 (N.D.Cal.1996). Because I find that the Plaintiffs cannot satisfy these requirements, the Defendants' objection to the Plaintiffs' use of Wilkins's notes relative to Mace's statements is sustained.

### Acceptance and PricewaterhouseCoopers Business Documents

Defendants seek to strike other exhibits offered in opposition to their motion as

---

4. Nor are the passages admissible under present sense impression because the notes contain the author's interpretation or analysis, and this subjectiveness is in clear violation of the theory underlying Rule 803(1). See Fed. R.Evid. 803(1) and 1972 advisory committee notes.

hearsay. Plaintiffs contend that these documents fit within an exception to the hearsay rule and would be admissible in a trial. Exhibits 5 and 6 are copies of so-called "representation letters" that were written by Mace to Terrence M. O'Brien, for use by Acceptance's independent actuary. Defendants objects to Plaintiffs' use of exhibits 5 and 6 because they have not been authenticated and they are incomplete. Having reviewed O'Brien's and Mace's depositions, I conclude that Exhibits 5 and 6 have been sufficiently authenticated and are admissible under Rule 803(6) as business records. O'Brien at 110–113; Mace at 104–108.

Exhibit 17 is a document entitled "Overall Summary" which was prepared for Acceptance Indemnity Insurance Companies for December 31, 1997, which the Defendants characterize as a workpaper prepared by PricewaterhouseCoopers ("PwC") that were included in documents connected to its initial analysis of Acceptance's loss reserves for 1997. Although O'Brien identified the document, I conclude that he did not property authenticate it and he did not provide sufficient foundation for admission of the exhibit under Rule 803(6). O'Brien at 83.

■■■ Exhibit 20 is a copy of Acceptance's Board of Directors meeting minutes for November 8, 1999, which is admissible under Rule 803(6). Coon at 87.

Exhibit 21 is a copy of document entitled "Project T-bone Indications of Interest" that was purportedly prepared by Warburg, Dillon, Reed, an investment banking firm, The firm was retained by Acceptance in 1999 to assist it with a potential sale of the company, and Coon identified the document and estimated that he received it sometime after August 1999. Coon at 99–102. However, I cannot find any testimony that lays the foundation required for admission under Rule 803(6), and so the document shall not be considered part of the record on summary judgment.

Based on the above analysis, the Defendants' Motion to Strike shall be granted in part and denied in part, consistent with this Memorandum

### Motion for Summary Judgment

The crux of the Plaintiffs' claims is that the Defendants misrepresented Acceptances' risks of loss and the adequacy of its loss reserves as a result of the now well-known 1995 California Supreme Court decision, *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995). It is undisputed that *Montrose* and its progeny created a challenge for insurers who were covering risks associated with California contractors because the pricing of the contractors' premiums on policies sold before the *Montrose* decision did not contemplate the higher loss ratio occasioned by *Montrose* and its subsequent application. Calpin at 134. I find no genuine dispute that the Defendants understood that there were potential ramifications to their business because of the *Montrose* decision, at least as such business related to insurance written for California contractors predating *Montrose*.

Defendants seek summary judgment on several grounds. First among their arguments is that no reasonable jury could find that the Defendants acted with scienter, which is a prerequisite to a finding of liability under 10(b) and Rule 10(b)–5. Because I agree that there is no evidence of scienter, I will grant the Defendants' motion for summary judgment.

### Undisputed Factual Background

The contractors' insurance business that Acceptance wrote accounted for no more than three percent of Acceptance's gross premiums and related to only two of approximately sixty profit centers comprising Acceptance Insurance Companies' busi-

ness. Nelson at 43–44; Coon Aff. ¶ 4; Mace Aff. ¶ 4.[5] Those two profit centers were Acceptance Risk Managers ("ARM"), run by Martin Caplin, and Acceptance's general agency office in Scottsdale, Arizona, (at times referred to in the record as "AIC West"), run by Tom Stamm.

Defendants Coon, Mace, and Nelson were the only individuals at Acceptance who participated in setting Acceptances' loss reserves, and they operated with the support of Acceptance's independent actuary, O'Brien,[6] working through PwC, and with the oversight function of Acceptance's independent auditor, Wilkins, working through D & T. To develop a bulk reserve estimate, they independently reviewed patterns and trends in claims experience, paid claims, historical reserves, and other relevant data, and they considered whether any adjustment to the loss reserves was required based on actual developments. Following their individual analyses, they met to consider each other's opinions and set their best estimate of Acceptance's total bulk reserves. Mertz characterized this process as a negotiation. They went through this exercise quarterly. Coon at 22, 64; Mace at 26–28, 74; Nelson at 39–41; O'Brien at 131; Mertz at 27; and see the Affidavits of Coon, Mace and Nelson at Filing No. 242.

PwC was retained by Acceptance to conduct independent actuarial reviews of the company's loss and loss adjustment expense reserves on at least an annual basis. Terrence O'Brien and Edward Wagner were the actuaries who provided professional services to Acceptance. O'Brien at 8–15, Wagner at 9–10. This review resulted in the preparation of actuarial opinions and reports, which are contained in Defendants' Exhibit 3 and 7. According to PwC,

Acceptance provided them with the information and data that PwC needed to render their opinions. O'Brien at 90–94; Wagner at 50–54. PwC analyzed the relevant information and arrived at a range of reasonable values for Acceptance's loss and loss adjustment expense reserves and selected one point within that range, referred to as the best point estimate, of values for the reserves. O'Brien, 87–94, Wagner at 50–55. PwC informed Coon, Nelson, and Mace of its best point estimate. PwC informed the Defendants that it would certify a reserve amount chosen by them, provided that the amount selected was within the estimate range of reasonable values. O'Brien at 134–35; Coon at 29–30, 63; Mace at 72–3; Nelson at 132; Wilkins at 24; and Exhibits 3 and 7.

No dispute exists that in the years 1996, 1997, the best point estimate provided by PwC was higher than the amount actually reserved by the Defendants, but still within the five percentage points necessary to obtain PwC's certification. In 1998 and 1999, the PwC's best point estimate was lower than the amount actually reserved. Thus, it is undisputed that for each of the years 1996 through 1999, Acceptance's reserves were "within a reasonable range of acceptable estimates" as established by Acceptances's independent actuaries, PwC. PwC issued opinions annually for years ending 1996 through 1999, certifying that Acceptance made reasonable provision for all reasonably projected, unpaid, loss and loss adjustment expense obligations. *Id.*

In its independent auditor role, D & T reviewed PwC's methodologies so that it could rely on PwC's opinions for use in its own auditor's report. D & T found PwC's opinions to be reliable, and D & T issued

---

5. The Affidavits of Coon, Mace and Nelson are found at Filing No. 242, Exhibit B "Domitrovic Affidavit" at Exhibit 2 to the affidavit.

6. Coopers & Lybrand, the original actuary, merged with PriceWaterhouse and became PricewaterhouseCoopers ("PwC").

independent auditing opinions in 1996, 1997, 1998, and 1999, that Acceptance's consolidated financial statements presented a fair picture of the company, and were prepared in conformity with generally accepted accounting principles ("GAAP"). Wilkins at 11–12, 23–24 76–77; Defendant's Exhibit 5; Coon at 28.

Best's Insurance Report reported in 1998 and 1999 that Acceptance was subject to increased exposure as a result of *Montrose* and related judicial rulings. Much of the Plaintiffs' evidence, including testimony from Mertz, Calpin, Duffet and Seaholm, does not directly bear on the setting of reserves and under-reserving because these former employees were not involved in establishing Acceptance's reserves.

**Reaction to *Montrose***

After the *Montrose* decision, Acceptance took action on the sales and underwriting side to restrict its *Montrose*-related exposure. In 1995, Acceptance began to place exclusions on those policies that had a *Montrose*-related exposure, and by 1997, all Acceptance policies had the exclusion. Nelson at 58–9, 88. The endorsement was refined as *Montrose* was adopted in more jurisdictions and applied in different factual scenarios. Duffet at 53, Coon at 60; Nelson at 55; Seaholm at 88. In addition, Acceptance took steps to limit its exposure by restricting the policies that could be written, and, in the Scottsdale office, Acceptance stopped writing coverage for developers, general contractors, and framing contractors for new construction. Seaholm at 74–79, 92–93; Kinder at 44.

The evidence is that certain employees of Acceptance recognized, in 1997, that there was an increase in the number of claims coming from policies written by the Scottsdale office. Mertz. at 93; Kinder at 72; Haney at 53. Coon acknowledged that he knew from Seaholm that the Scottsdale office's loss ratios were rising. Coon at 113. However, as explained by Accep-

tance's then Vice President of Claims, Robert Haney, although he became aware of an increase in California construction defect claims, he could only partially attribute that to *Montrose* because the office had been writing more business, and he had expected to see an increase in claims directly related to the increase in written premiums. Haney at 53–59. Coon also stated that although he was aware that the Scottsdale office's loss ratio was rising, he had no indication that contractor claims were coming in at a rate higher than the general liability claims. Coon at 113–14.

It is undisputed that Haney had prepared a report in March of 1999 showing an increase in the claim count for California contractor claims. However, as Nelson explained, the information in Haney's report was raw data.

> [C]laim count by contractor is subject to two variables which I had to deal with. One is that there are all kinds of other claims from contractors that are not necessarily construction defects [to which *Montrose* would apply]. People break windows, they fall down steps, they do all those things. So, mixed into that, there could have been a significant ... number of claims which were not necessary related to construction defect, but just related to that class. Also, the difficulty in that kind of report is that...you really can't tell ... [whether] you would have a natural increase in claims due to volume that would not be abnormal.

Nelson at 98.

Mace analyzed claims as part of her regular responsibilities, and she was keenly aware of the need to detect unusual developments, but it was not until 1999 that she was able to recognize a pattern of increasing construction claims coming out of California. She explained that the $44 million strengthening of Acceptance's loss adjustment expense reserve, which was

referenced in the November 15, 1999, press release, was caused by, "[n]ewly-reported claims coming into the company in 1999" which she detected in "September or October" of 1999. Mace at 192, 193–94. Mace explained:

> It realty began with me noticing in September or October new claims coming in on old, old prior years that we did not expect. And ... what that generated is a ripple effect all the way through the accident years, anticipating that ... situation will happen in the newer years. We did not anticipate those IBNR claims coming in.... We always had reserves up for IBNR, but this came in more than what we expected. And when I saw that happening, then I did my research to make sure I isolated what was coming in, because when I saw it come in, I didn't know that it was contractors until I dug deeper in .. reports. And then I called Terry O'Brien and we had discussion.... I said I want you to look at this, look at this hard. I need your guidance, because something like this is not what the company anticipated. If we would have anticipated this, we would not have had the loss reserves up.

Mace at 193–94.

PwC confirmed the increased claims development in the third quarter of 1999. O'Brien stated that the development of increased contractor claims in 1999 was unexpected and that, prior to the third quarter of 1999, the development pattern for Acceptance's California contractors' insurance had been consistent with the normal general liability loss development until the third quarter 1999. O'Brien at 137–139.

On the November 15, 1999, Acceptance issued a press release in which it announced that it would "record a loss of $25.2 million or $1.77 per share for the third quarter, and $18.3 million or $1.28

for the first nine months, of 1999," resulting "primarily from a strengthening of loss and loss adjustment expense reserved for prior periods of approximately $44 million ..." Filing No. 40 at ¶ 39. Acceptance also explained its reason for the loss, stating that it had experienced an increase in claims, discovered during the Company's annual third quarter actuarial study, and that it found the increase in claims to be "primarily associated with policies the Company issued prior to 1996 to California contractors and subcontractors." The Company explained the impact of the *Montrose* opinion: "In 1995, the California Supreme Court dramatically altered the framework of insurance coverage for construction defect claims by adopting the 'continuous trigger' theory for losses involving continuous or progressive damage. The increase in unreported claims arose primarily from policies issued before this court decision." *Id.*

### Actuarial Opinions and Disclosures

PwC's 1996, 1997, 1998, and 1999 Actuarial Opinions included cautionary language and expressed the limitations of the opinions. For example, the 1996 and 1997 opinions stated:

> I have assumed that coverage will not be broadened by legislative action or judicial interpretation. The Estimate makes no provision for extraordinary future emergence of new classes of losses or types of loss not sufficiently represented in the Company's historical data base or which are not yet quantifiable.

Exhibit 3 and 7. In addition to the language in the 1996 and 1997 opinions, the 1998 and 1999 Opinions also included:

> In evaluating whether the reserves make a reasonable provision for unpaid losses and loss adjustment expenses, it was necessary to project future loss and loss adjustment expense payments. It is certain that actual future losses and

loss adjustment expenses will not develop exactly as projected, and may, in fact vary significantly from the projections.

*Id.* Plaintiffs rely heavily upon the representation letters which were written in a collaborative effort between Mace and O'Brien, primarily with O'Brien's input and Mace's approval, in 1998. Filing No. 249, Exhibits 5 and 6. The 1998 representation letters contain this statement, which is not reflected in PwC's opinions:

> Acceptance Indemnity Insurance Company has the following risk factors that expose the Company's reserves to significant variability: 1) The Company writes a contractors program, in California, which has generated construction defects claims. Estimation of ultimate liabilities for these claims is unusually difficult due to the lack of specific historical data.

*Id.* Consistent with the National Association of Insurance Commissioner's ("NAIC") Annual Statement Instructions, Defendants filed the PwC Actuarial Opinions with Acceptance's annual statements for each year: 1997, 1998, and 1999, and those documents have been available to the public through the Nebraska Insurance Commission beginning on March 1, 1998. Mace Aff. at ¶ 10.

In addition, Acceptance's Form 10–Ks which are at Filing No. 242, Exhibit 5, contain significant cautionary language in both the Loss and Loss Adjustment Expense Reserves Sections and in the "Uncertainties Affecting the Insurance Business" sections of the reports, which have been quoted extensively in prior court opinions. Exhibit 5, generally at pages 4, 6, and 12 of each Form 10–K.

**Prima Facie Case**

The Plaintiffs' class action claims are brought under Section 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78j and 78t(a) (the "Exchange Act") and Rule 10(b)–5, 17 C.F.R. § 240.10b–5.[7] Rule 10b–5, promulgated by the Securities and Exchange Commission under Section 10(b) of the Act, prohibits fraudulent conduct in the sale and purchase of securities. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5; *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001) *reh'g and reh'g en banc denied* (hereafter *"Green Tree"); In re Nations-Mart Corp. Sec. Litig.*, 130 F.3d 309, 320 (8th Cir.1997).

Section 20(a) of the Exchange Act extends liability under section 10(b) and Rule 10b–5 to any "controlling person." 15 U.S.C. § 78t(a). Thus, Section 20(a) can impose liability upon corporate officers and directors, even in those cases in which they did not directly participate in the bad acts. See *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985). "Section 20(a) extends liability well beyond traditional doctrines, providing expansive remedies in a highly regulated industry." *Green Tree*, 270 F.3d at 653–54.

Rule 10b–5 provides that it is unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or

---

**7.** The Plaintiffs' motion to amend the complaint to add claims based on Sections 11 and 15(a) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o (the "Securities Act") was denied.

would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. See also, *In re Navarre Corp. Securities Litigation,* 299 F.3d 735, 741 (8th Cir.2002).

A prima facie case under Section 10(b) and Rule 10b–5 requires a plaintiff to show (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1533–34 (8th Cir.1996).

■ "Although not explicitly mentioned in the text of the rule, scienter is nevertheless an essential element of a Rule 10b–5 claim." *Green Tree,* 270 F.3d at 653. "Scienter" means the intent to deceive, manipulate, or defraud. *In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 320 (8th Cir.1997). At least one court in this circuit has expressly held that any liability faced by a corporate defendant in a Section 10(b) case requires a demonstration that at least one agent of the corporation possessed the requisite scienter. *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.,* 38 F.Supp.2d 771, 779–80 (D.Minn. 1999).

Because I find that the Plaintiffs have failed to come forward with facts to demonstrate that the Defendants acted with scienter, I will grant the Defendants' motion for summary judgment on all claims against them in the Amended Consolidated Class Action Complaint.

## Scienter Analysis

■ The Eighth Circuit Court of Appeals has recognized three different ways that a plaintiff may show scienter in a § 10(b) claim. A plaintiff may show scienter "from facts demonstrating 'a mental state embracing intent to deceive, manipulate, or defraud;'" or from facts showing "conduct which rises to the level of severe recklessness," or from facts showing "motive and opportunity." *In re K-tel Intern., Inc. Securities Litigation,* 300 F.3d 881, 893–894 (8th Cir.2002). Evidence that the First Circuit Court has found relevant to scienter, which view the Eighth Circuit has approved, includes:

> insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent Information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest.

*In re Navarre Corp. Securities Litigation* 299 F.3d 735, 747 (8th Cir.2002) (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999)(reciting compilation of First Circuit cases)).

## A Mental State Embracing Intent to Deceive, Manipulate, or Defraud.

Defendants contend that the Plaintiffs simply have no facts to demonstrate that the Defendants had the mental state to deceive, manipulate or defraud their investors. I agree. I find no evidence of such a mental state in Coon, Mace, or Nelson. Thus, whether there is evidence of scienter that can overcome the Defendants' otherwise proper motion for summary judgment turns on whether there is evidence to show a genuine issue of material fact as to the Defendants' recklessness, or as to the Defendants' motive and opportunity.

## Recklessness

■ Defendants argue that absent evidence of a motive to commit fraud, the Plaintiffs must come forward with some

evidence that the Defendants acted recklessly with the information they possessed. Defendants contend that they monitored the claims activity, and monitored the activity coming from the California contractor policies written before *Montrose*. Defendants had a procedure in place that they used year-in-and-year-out to set reserves, which included the collaboration with PwC and the audit of D & T. The individuals who were responsible for setting reserves set them within a set estimate range that PwC's O'Brien certified.

Plaintiffs argue that summary judgment should be denied because they have submitted evidence demonstrating that *Montrose* caused an increase in claims and lawsuits at Acceptance during the relevant period; because other insurance companies were being affected by the claims and publicly disclosed additional risks posed by *Montrose;* because Acceptance was under-reserved for what the Plaintiffs have referred to as *"Montrose*-related" claims; and because Acceptance's financial statements during the class period were false and misleading. Plaintiffs argue that Defendants' scienter is demonstrated by their reckless disregard of the increase in the number of contractor claims from California, their failure to adequately disclose the claims activity and the risk associated with *Montrose* specifically, and their failure to adjust their reserves to cover the *Montrose*-related claims.

In asserting that the Defendants knew that *Montrose* had created additional claims, Plaintiffs rely, in part, on a January 3, 1997, memo stating, "[i]t appears that the *Montrose* decision has created a bubble of claims up until the mid–1990's," which Haney forwarded to Coon. Haney at 104–05. Plaintiffs contend that the Defendants had knowledge of potential risks and losses and actual losses that should have been disclosed, but were not disclosed, in their publicly-filed documents, and that

such disclosures should have been made during the class period commencing after the first quarter of 1997. The Defendants' disclosure about an increase in contractor claims and the effect of those claims on Acceptance's reserves was made in the form of a press release on November 15, 1999.

Coon stated in his deposition that before 1999, he knew that Acceptance had received California contractor claims. In October 1998, he was aware that the Scottsdale office's loss ratios were rising, and that when he tried to understand why that was occurring, he looked at reported claims and claims amounts. What he found was that Acceptance had increasing loss activity in both the general liability line and the California construction line. Coon at 91, 113–14.

When asked why Acceptance did not publicly disclose the risk of higher claims as a result of *Montrose*, prior to November 1999, Coon stated:

> We had taken a look and done a study of our general liability claims and our construction-related claims in California, ... this was in the fall of 1997, to see if there were differences in the emergence patterns of claims, if we needed to treat those claims separately. At that time, as I recall, the finding was that no, ... they appear to be emerging as your general liability claim, we'll continue to monitor them, but right now, we're [not finding] ... any need to separate them out in terms of a separate reserving practice....
>
> [W]e felt the risk was the same as our general liability business which we had described as a risk factor previously.

*Id.* at 136.

Courts have held that allegations of violations of GAAP are insufficient, standing alone, to raise an inference of scienter. *Novak v. Kasaks,* 216 F.3d 300, 309 (2nd

Cir.2000), and that "[p]ublication of inaccurate account figures (or failure to follow GAAP) without more, does not establish scienter." *In re Bell Atlantic Corp. Securities Litigation*, 1997 WL 205709, *30 (E.D.Pa.1997). Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient. *Id.* See also *In re Navarre Corp.*, 299 F.3d at 745.

Recklessness of the kind needed to show scienter was described by the Eighth Circuit Court as conduct "limited to 'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and ... present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *In re K-tel*, 300 F.3d at 893 (citing *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.1985)). I find no evidence of this kind of recklessness in the record before me. To the contrary, the record is replete with information about the procedures that were in place before *Montrose*, and which were followed, even after *Montrose*, to ensure satisfactory reserves and profitability in business. Certainly there is undisputed evidence that the Defendants had some awareness of the risks posed by *Montrose*, and the Defendants had some knowledge of claims numbers rising and falling. However, this evidence is not sufficient to create a genuine issue that the Defendants acted recklessly.

The testimony of Mace is undisputed. As the Chief Financial Officer and Treasurer, she under took the responsibility for tracking the company's reserves, and she specifically monitored the claims activity, looking for trends and patterns that were out of the ordinary. She did not find such a thing until 1999. There is no evidence that anyone at Acceptance was keeping information from her, and there is no evidence contradicting her testimony.

Based on all this factual information, I conclude that there is no evidence that the Defendants acted with the kind and degree of recklessness required to demonstrate scienter required for this securities fraud action to survive summary judgment.

**Motive and Opportunity**

The Eighth Circuit has recognized that motive and opportunity are generally relevant to a Section 10(b) and Rule 10(b)–5 action, "but particularly important to establishing scienter is a showing of unusual or heightened motive..." *Green Tree*, 270 F.3d at 660. The Eighth Circuit endorsed the Second Circuit Court's approach to a scienter analysis based on motive and opportunity. The Court noted that the Second Circuit has held that motives generally possessed by all corporate directors and officers are insufficient as a matter of law. *Id.* at 664 (finding a desire "universally held among corporations and their executives ... does not contribute significantly to an inference of scienter"), and *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001)(holding that "plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud.")

"The Second Circuit has found insufficient motives to include '1) the desire for the corporation to appear profitable and 2) the desire to keep stock prices high to increase officer compensation.'" *Green Tree*, 270 F.3d at 664. However, alleging that defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock *is* sufficient. *Novak*, 216 F.3d at 308. In contrast, evidence that the individual defendants abstained from trading may undercut allegations of motive. *Green Tree*, 270 F.3d at 663 (noting same, but finding no allegations of insider trading).

The Eighth Circuit has found, in the context of pleading requirements, that where an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the timing of an overstatement of earnings, motive is sufficiently pled. *Green Tree,* 270 F.3d at 661. In the same decision, the Eighth Circuit noted that "the general desire to maintain a high credit rating or make a company appear attractive to potential buyers may be 'too thin a reed on which to hang an inference of scienter.'" *K–Tel,* 300 F.3d at 894 citing *Green Tree,* 270 F.3d at 664. The Eighth Circuit found rejected allegations of these motives as insufficient to support scienter: "(a) inflating the price of K-tel's common stock, (b) avoiding or delaying NASDAQ delisting, (c) deferring adverse effects of NASDAQ delisting, (d) increasing compensation directly tied to stock price, and (e) protecting employment with K-tel." *Id.,* at 895.

The Eighth Circuit has also held that allegations of GAAP violations, alone, are insufficient to state a claim for securities fraud. *In re Navarre Corp.,* 299 F.3d at 745. Here, the independent auditor provided opinions for each of the relevant years that Acceptance's financial statements satisfied GAAP requirements as contained in the Forms 10–K. Filing No. 242, Ex. 5.

Defendants contend that there is no evidence that they had a motive to commit fraud, and that there is no evidence to demonstrate that they knew they were committing fraud or were acting recklessly in handling the information that came to them in their capacity as officers. Defendants argue that they had no motive to profit from increased stock prices, to profit from incentive awards, or to protect their positions. *In re K–Tel* has made it clear that motives common to all corporations and their executives are legally insufficient to demonstrate scienter. I find no evidence that any of the Defendants had a profit motive that differed from any other corporation or corporate executive. Certainly there is evidence that the officers wanted to increase earnings for the corporation, but that is a pressure incurred and felt by any typical corporate executive. Certainly, there was evidence that the officers had a motive to make the corporation appear strong in order to negotiate a sale in 1999.

It is compelling evidence relevant to motive that the record establishes that none of the individual Defendants sold stock on the open market during the class period, and that, in fact, the individual Defendants and the corporation acquired stock during the class period. Coon and Mace surrendered option shares to acquire additional shares of Acceptance stock, known as a cashless exercise, which actually had the effect of increasing their holdings of Acceptance stock during the relevant class period. Coon at 109–11. Mace at 53.

Defendants also argue that there is no factual basis for Plaintiffs' argument that the Defendants had a motive for committing fraud in order to avoid a hostile takeover. On April 26, 1999, the Acceptance Board approved the retention of an investment banking firm to "reduce the risk" to shareholders posed by what the Board believed to be the market's then undervaluing of Acceptance stock. The Eighth Circuit has recognized that the desire to make a company appear more attractive to potential buyers is insufficient motive to establish scienter, *see In re K–Tel,* 300 F.3d at 894; see also, *Green Tree,* 270 F.3d at 664; and at least one court has found that "preventing hostile takeovers ... [is a] common, day-to-day goal of corporate management" that does not evidence scienter." *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1358 (S.D.Fla.1998). *But see, Wein-*

*er v. Quaker Oats Co.,* 129 F.3d 310, 318 (3rd Cir.1997).

 While it is true that the "issue of whether a particular intent existed is a question of fact for the jury," a Section 10(b) complaint must provide a factual basis for allegations of scienter. *K–Tel,* 300 F.3d at 894, citing *In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 40 (2nd Cir. 2000). I can find no facts in this rather voluminous record to demonstrate that the Defendants acted with the scienter necessary to establish liability. "[T]he absence of ... scienter .... is sufficient to support a motion for summary judgment." *Bell Atlantic,* 1997 WL 205709 at *22. See also *In re Digi Int'l Inc. Sec. Litig.,* 14 Fed. Appx. 714, 717 (8th Cir.2001)(affirming summary judgment for defendant based on lack of evidence to support scienter). Because I conclude that there has been no showing of scienter, I will grant the Defendants' motion and enter summary judgment in their favor.

### Conclusion

For all the reasons stated above, I conclude that the Plaintiffs have failed to come forward with evidence to show scienter, and that the Defendants are entitled to summary judgment as a matter of law.

IT IS ORDERED:

1) Plaintiffs' Motion to Strike Defendants' Evidence (Filing No. 258) is denied;

2) Defendants' Motion to Strike Plaintiffs' Evidence (Filing No. 254) is granted in part and denied in part, consistent with this Memorandum;

3) Defendants' Motion for Summary Judgment (Filing No. 241) is granted in all respects;

4) All other pending motions are denied as moot; and

5) A separate judgment in favor of the Defendants will be filed in conjunction with this Memorandum and Order.